Filed 8/12/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DARBUN ENTERPRISES, INC., | B233078 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC050725) |
| v. | |
| SAN FERNANDO COMMUNITY HOSPITAL, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Donna Fields Goldstein, Judge. Reversed and remanded.

Squires, Sherman & Bioteau and Bruce Sherman, for Plaintiff and Appellant.

Arent Fox, Debra Albin-Riley and Steven A. Haskins, for Defendant and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IB and II of the Discussion.

Plaintiff Darbun Enterprises, Inc., doing business as (dba) All Saints Healthcare (Darbun), sued defendant San Fernando Community Hospital, dba Mission Community Hospital (Mission), for breach of a lease agreement, seeking damages and specific performance.

The trial in this case proceeded in two phases. The first, the equity phase, was held to determine whether the equitable remedy of specific performance was available should Darbun prevail. The court reserved the issues of breach and resulting contract damages for the jury. At the end of the equity phase, however, the trial court stated it could not decide on the specific performance issue until it heard additional evidence, to be presented at the jury trial. The jury, which already had been seated and sworn, was called and the second, legal, phase of trial commenced. After Darbun presented its case, Mission moved for nonsuit. The trial court granted that motion as to specific performance only. It found that, after weighing the evidence and making credibility determinations as the equity factfinder, the lease could not be specifically performed, and that Darbun had failed to perform its obligations under the lease. Nevertheless, the trial continued, and after Mission rested, it moved for a directed verdict. The court denied that motion. The jury found in favor of Darbun and awarded damages; the court entered judgment for Darbun. Mission then filed a motion for judgment notwithstanding the verdict (JNOV). That motion was granted. The court based its decision on findings it had made on the motion for nonsuit. The court reasoned that since it already had found the lease to be "unenforceable" and Darbun had failed to perform its obligations, there was no substantial evidence to support the jury verdict in favor of Darbun.

In the published portion of this opinion, we hold that, in cases involving mixed issues of equity and law, a trial court may not act as a factfinder on issues it specifically reserves for jury determination. Here, in granting JNOV, the court improperly transformed its equitable finding of unenforceability as to specific performance into a

finding of unenforceability as to the legal issue of damages.[1]  In the unpublished portion of this opinion, we conclude there was substantial evidence to support the jury verdict.  We therefore reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL SUMMARY

### A.    Lease Agreement

On October 18, 2006, Darbun and Mission entered into a 30-year lease for one of Mission's hospital buildings, called the North Tower.  Darbun planned to redevelop the North Tower into a subacute or long term acute care unit, though the lease permitted Darbun to operate it for "any other use allowed by law other than a general hospital."  Both parties recognized that Darbun would be required to "invest hundreds of thousands of dollars in due-diligence investigation, planning, permitting and development costs over a substantial and undetermined period of time, before it could improve and utilize the North Tower."  Accordingly, the lease provided that Darbun would not be responsible for rent payments until its first patient had been admitted, after completion of construction and licensure of the facility.  Although the lease noted that time was of the essence, it did not specify time limits within which Darbun was required to complete renovations.  This was due to the fact that Darbun's progress was heavily dependent upon approvals from government entities.  The lease contained no provision pertaining to Darbun's use of Mission's license to operate the property.  Further, the lease provided that Darbun's failure to perform any of its contractual duties, aside from failure to pay rent, would not constitute a breach unless (1) Mission provided a 30-day notice to cure, and (2) Darbun failed to cure within the 30 days or failed to proceed to "prosecute[] the cure to completion with dispatch."

---

[1] In this opinion we use the terms "law" and "legal" in the context of the distinction between issues arising from law and equity, rather than the more general usage of those terms.

## B.    Darbun's Performance and Mission's Termination of Lease

Darbun initially planned to operate the North Tower as a long term acute care hospital (LTACH).  In March 2007, Darbun discovered that developing the tower as an LTACH would require significant seismic improvements, rendering the project "economically unfeasible."  It began to explore the idea of operating a skilled nursing facility.  Darbun believed it was possible to operate a skilled nursing facility under Mission's license, essentially being "grandfathered" in to avoid having to make costly seismic upgrades.

Both parties understood that construction could not begin until Darbun obtained a parking variance from the city.  Darbun sought the variance upon signing of the lease and did not commission construction plans until the variance was approved.  The variance was approved 13 months later in November 2007; the parties stipulated this was a reasonable amount of time.  In early December of 2007, Darbun was notified of a public law placing a moratorium on new LTACHs.  As a result, Darbun decided to pursue development of a skilled nursing facility and no longer considered running the North Tower as an LTACH.  Darbun drafted preliminary conceptual plans and submitted them to the Office of Statewide Health Planning and Development (OSHPD) in December 2007.  It also sent a copy of the plans to Mission.  The plans omitted structural, mechanical, or electrical specifications because Darbun sought to ensure that its proposal "would be acceptable to OSHPD" before investing additional time and resources into the project.

In that same month, Mission's attorney told representatives of Darbun that Mission wanted to terminate the lease.  No written notice was provided at this time, and Darbun continued to perform under the lease.  Mission was aware of Darbun's ongoing efforts because Mission's representatives visited the North Tower at least four times between November 2007 and August 2008, and during those visits, Mission did not indicate dissatisfaction with Darbun's performance.  In February 2008, OSHPD reviewed and returned the preliminary plans for "further work," which Heidi Lennartz, chief executive officer of Mission, testified was the "typical course" of procedure.  In

4

September 2008, John Paul Sensibile, facility administrator of Darbun, met with Ms. Lennartz, and expressed Darbun's intent to begin operating its skilled nursing facility under Mission's license. Although Ms. Lennartz "felt that the hospital was beginning to be kind of cornered into cooperating beyond the terms of the lease," she did not express her concern to Mr. Sensibile. A few weeks later, Ms. Lennartz learned that the plans Darbun had submitted to OSHPD were designed in such a way that would "require that [Mission] license the skilled nursing facility under its own license" and allow Darbun to operate under it. Ms. Lennartz e-mailed Mr. Sensibile to "clarify the confusion," "express to him that [the] Department of Health had concerns," and request an update on Darbun's progress. Mr. Sensibile sent a letter to Ms. Lennartz in response to her request. Ms. Lennartz did not respond to Mr. Sensibile's letter. Darbun resubmitted its plans to OSHPD in October 2008.

Mission's next communication with Darbun occurred on October 16, 2008, when Mission sent Darbun a 30-day notice terminating the lease. The basis of termination was Darbun's failure to complete improvements to the premises within a reasonable period of time. There was no provision giving Darbun an opportunity to cure. Mission sent another letter on December 3, 2008 notifying Darbun the lease was terminated. This notice, however, cited the licensing issue as the main reason for termination, stating that, because Darbun assumed that it would operate under Mission's license, "it will not be possible for [Darbun] to maintain, provide, and bill for services independent from the hospital as contemplated in the Lease." Noting that "Mission Community Hospital is not interested in entering into any further agreements or joint venture arrangements," the notice confirmed the termination of the Lease.

### C. Pretrial Proceedings

Darbun filed a complaint against Mission alleging, among other things, breach of contract, and sought specific performance and damages. Darbun recorded a notice of lis pendens on the property on August 17, 2009. Mission filed a motion to expunge the notice of lis pendens, which the trial court granted after finding Darbun had not demonstrated the probable validity of its specific

5

performance claim.[2]

Mission then filed a motion to bifurcate the trial into separate equitable and legal phases. It asked that the equitable issue of specific performance be tried first, to the court; this would permit the court to act as the factfinder for each element of the specific performance claim, including Darbun's performance and Mission's breach. Darbun opposed the motion and proposed that the equitable and legal issues be tried simultaneously so that the "[c]ourt can determine whether to order [s]pecific [p]erformance and the jury can proceed to decide the remaining legal claims without the need to repeat evidence or witnesses." The court declined to follow either approach. Instead, it decided to conduct a separate phase of trial in order to determine whether the equitable remedy of specific performance was appropriate. The court made it clear that this first phase was not being held to *adjudicate* the specific performance claim, which would require the court to make findings on the issue of breach: "I'm not going to go through the breach. I don't want to hear about the breach, about how much you've put into it, the merits of the breach of contract." Before the first phase began, the court reiterated to the parties that "I don't want to focus on breach."

### D.    First Phase of Trial

During the first phase of trial, Pamela Rupp, the vice-president in charge of

---

[2] The court stated six grounds for its finding that Darbun was not likely to prevail on its specific performance claim: (1) The terms of the lease required that Darbun complete a "succession of acts" which required a court order "that will require an extensive amount of time to complete"; (2) the lease was unenforceable because it left an "essential term"—the use of Mission's license—to "future agreement"; (3) Mission would need to cooperate by transferring its license to Darbun in order for the parties to successfully perform the contract; (4) the duties to be performed were continuous and would have required protracted court supervision; (5) the remedy of specific performance was not mutual to both parties because that remedy, applied to Darbun, would require it to provide personal services to Mission (see *Lind v. Baker* (1941) 48 Cal.App.2d 234, 246 [remedy of specific performance must be mutual and test for mutuality is whether the agreement is "of such a character that at the suit of either, a court of equity would decree specific performance against the other"]); and (6) the "precise acts required of the Plaintiff [could not] be clearly ascertained."

6

operations for Darbun, Daniel Bunn, the president of Darbun, and Mr. Sensibile testified to two alternative ways that Darbun could begin operating as a skilled nursing facility. The first scenario required Mission to first obtain a license and transfer ownership to Darbun, at which point Darbun would apply for its own operating license. The second scenario did not require Mission's cooperation; Darbun could obtain an operating license on its own, but would suffer a delay in being able to admit patients while waiting for approval. During discovery, however, the witnesses had represented that Darbun would initially operate under Mission's license. They had not suggested that Darbun would be able to obtain its own license without Mission's cooperation. When confronted with their statements, the witnesses explained that Darbun had proceeded under the Mission would cooperate because it would allow Darbun to admit patients sooner, would allow Mission to start collecting rent earlier.

After the first phase of trial, the court indicated Darbun had "presented a curve ball" because "[f]or the very first time," Darbun had presented an option under which it could obtain an operating license without Mission's cooperation. Based on the changed testimony, the court indicated it could not yet make a ruling on the availability of specific performance as a remedy: "I'm going to wait for the rest of the evidence to come in in light of the testimony that I heard . . . . I believe the safest course would be for the court to hear it through before determining on— before making a decision on specific performance, and that's what I will do." The court stated the case would continue to jury trial, stating, "whether I use the jury as an advisory jury on breach or just simply when I've heard enough evidence to decide, I'll let you know . . . ." It stated whether Mission had cause to terminate the lease was "for the jury now to decide." The trial court, during jury selection, informed the prospective jury members that "[i]t will be up to you to decide" whether Mission improperly terminated the lease or whether it had cause to do so because Darbun failed to perform under the lease.

E.     Second Phase of Trial

7

Darbun commenced its case-in-chief in front of the jury. Relevant testimony included those of the witnesses who testified during the equitable phase of trial. Darbun also called the architect, Edward Morse, who had been retained to develop plans for the North Tower. Mr. Morse testified that Darbun was considering the possibility of operating an LTACH or a skilled nursing facility, and drew up plans for both. He described the different seismic standards that governed LTACHs and skilled nursing facilities. Mr. Morse then testified about the architectural plans he submitted on behalf of Darbun. When asked about the licensing requirements for a skilled nursing facility or LTACH, Mr. Morse stated that he did not "usually get involved in the licensing." He could testify only as to the code requirements of those buildings but not to who was entitled to operate them. On cross-examination, Mr. Morse testified that Darbun's plans for a skilled nursing facility were based upon the initial use of Mission's operating license to avoid bringing the North Tower up to code, though he "was under the impression that the facility would be operated by Darbun."

### 1. *Mission's Motion for Nonsuit*

At the close of Darbun's case-in-chief, Mission moved for nonsuit. It argued Darbun failed to perform its obligations under the lease by improperly assigning the lease to another entity, D.E.I. Healthcare, LLC (D.E.I.),[3] and that it failed to prove damages. The court asked Mission whether it was moving for nonsuit as to specific performance; Mission responded that it was. After argument, the court stated that "specific performance is equitable," the jury is serving as an advisory jury, and "[i]t is for the court to determine the facts for specific performance." The court then granted nonsuit on specific performance only.

The court provided several bases for its decision. It concluded that it was not reasonable for the court to oversee Darbun's performance of its obligations over the next three years. The court also stated that "there was breach by plaintiff[]" for failing to

---

[3] D.E.I. Healthcare, LLC is held by two business entities—Darbun and T.X.Z. Capital, LLC. Both Darbun and T.X.Z. Capital, LLC are owned by Mr. Bunn, who testified on behalf of Darbun at trial.

8

perform its obligations in a timely manner.  Nevertheless, the court denied nonsuit on the issues of breach and damages, stating "the jury still has to decide breach" and that if Darbun "can get . . . damages, get your damages."  The next morning, the court sought to "more specifically put . . . on the record" its reasons for granting nonsuit on specific performance.  It stated it would not credit the witnesses' trial testimony regarding Darbun's ability to obtain a license without Mission's cooperation.  The court incorporated its earlier lis pendens ruling, in which it had found that Darbun "ha[d] not demonstrated that the probable validity of its specific performance cause of action can be established."  It concluded, "based both on the evidence and the court's finding of credibility of the witnesses," that "this is not a contract that it can specifically perform."  Jury trial resumed.

### 2. *Jury Verdict*

During Mission's case-in-chief, it called one witness, Michael Stuart Poles, an expert witness on the construction plan and approval process.  After Mission rested its case, it moved for a directed verdict on the same grounds as it had put forward in its nonsuit motion.  The court denied the motion, stating "I'm going to let this go to the jury . . . ."

The jury returned a unanimous verdict in favor of Darbun.  Notably, the jury's special verdict found that Darbun did all, or substantially all, of the significant things that the lease required it to do, that all the conditions that were required for Mission's continued performance under the lease had been satisfied, and that Mission failed to do something the lease required it to do.  It found that Mission was not excused from its obligations under the lease, Darbun did not materially fail to complete its obligations under the lease, and Darbun was harmed by Mission's breach.  The jury awarded $294,819.06 in damages to Darbun for expenses it incurred during its performance under the lease.

### F. Mission's Motion for Judgment Notwithstanding the Verdict

Mission's motion for JNOV was granted.  The court stated that, in ruling on the

9

nonsuit motion, it had made findings that (1) Darbun had breached the lease by failing to perform its obligations within a reasonable amount of time, and (2) had proceeded in a manner that was not contemplated by the contract, rendering the lease unenforceable. Because "the law is clear that findings by the Court in an equitable action are binding on the remaining portion to be tried by jury," the court believed its findings on breach and unenforceability were binding on the jury. It found the jury verdict was not supported by substantial evidence because, once the court had made these findings, "nothing further remained to be tried by the jury." Judgment was entered in favor of Mission.

This timely appeal followed.

## DISCUSSION

### I

Darbun's claim against Mission involves both equitable and legal issues. "Historically, there were separate law and equity courts. . . . The separate law and equity courts were merged, but the distinction between law and equity remains to this day." (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 155 (*Hoopes*).) A jury trial is a matter of right in a civil action at law, but not in equity. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1237 (*Nwosu*).)

"Complications arise when legal and equitable issues (causes of action, requested remedies, or defenses) are asserted in a single lawsuit. . . . In most instances, separate equitable and legal issues are 'kept distinct and separate,' with legal issues triable by a jury and equitable issues triable by the court. [Citations.]" (*Hoopes*, *supra*, 168 Cal.App.4th at p. 156.) The order of trial in these mixed actions has "great significance because the first fact finder may bind the second when determining factual issues common to the equitable and legal issues." (*Ibid.*) Generally, in mixed actions, the equitable issues should be tried first by the court, either with or without an advisory jury.[4] (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 149, p. 187; *Nwosu*, *supra*,

---

[4] However, it is fully within a trial court's discretion to have a jury try the legal issues first. (*Hoopes*, *supra*, 168 Cal.App.4th at p. 157.) A jury's determination of legal issues may foreclose a subsequent bench trial on equitable claims.

10

122 Cal.App.4th at p. 1240.) Trial courts are encouraged to apply this "equity first" rule because it promotes judicial economy by potentially obviating the need for a jury trial. (*Nwosu*, at p. 1238; see also *Hoopes*, *supra*, 168 Cal.App.4th at p. 158 [allowing first factfinder's factual determination to bind the second "minimizes inconsistencies," "avoids giving one side two bites of the apple," and "prevents duplication of effort"].)

Darbun's breach of contract claim seeks damages and specific performance of the lease. "The standard elements of a claim for breach of contract are: '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom. [Citation.]' [Citation.]" (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1178.) A suit to recover damages for breach of contract is an "action at law in which a right to jury trial ordinarily exists." (*Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 (*Raedeke*).) A plaintiff may seek specific performance, an equitable remedy, as an alternative to damages, but a plaintiff may not receive both for breach of contract to the extent such an award would constitute a double recovery. (*Rogers v. Davis* (1994) 28 Cal.App.4th 1215, 1220.) To obtain specific performance, a plaintiff must make several showings, in addition to proving the elements of a standard breach of contract.[5] Notably, the terms must be sufficiently certain "to make the precise act which is to be done clearly ascertainable." (Civ. Code, § 3390, subd. (5).) Because specific performance is an equitable remedy, there is no constitutional right to jury trial on that remedy. (*Walton v. Walton* (1995) 31 Cal.App.4th 277, 287-288.)

---

[5] "A complaint for specific performance must allege the following: [¶] (1) A specifically enforceable type of contract, sufficiently certain in its terms [citation]. [¶] (2) Adequate consideration, and a just and reasonable contract [citation]. [¶] (3) The plaintiff's performance, tender, or excuse for nonperformance [citation]. [¶] (4) The defendant's breach [citation]. [¶] (5) Inadequacy of the remedy at law [citation]. [¶] In addition, the defense of the statute of frauds must be anticipated in the complaint. [Citation.]" (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 785, pp. 203-204.)

The difficulties presented in this case stem mainly from the trial court's inconsistent and misleading statements, which resulted in confusion among the parties and complicated the issues on appeal. The trial court explicitly stated, on several occasions, that it did not want to hear the issue of breach in the equitable phase of trial—that issue was for the jury to decide. The only evidence it was interested in during the equitable phase was that which pertained to specific performance. Yet, it made statements on the record in ruling on nonsuit that Darbun had failed to perform and had breached the contract.[6] The court also suggested the jury was an advisory jury on breach, but had not treated it as such.[7] Despite a seemingly dispositive ruling on Darbun's failure to perform, the court then told Darbun, "If you can get your damages, get your damages" and continued with jury trial. During the JNOV hearing, the court insisted that its statement pertaining to Darbun's breach was the basis for its decision to grant nonsuit, and that left nothing for the jury to decide.

Finally, the trial court's findings of Darbun's breach and unenforceability of the lease were improperly made in the context of a nonsuit motion, after the court weighed evidence and made credibility determinations. (See *Stonegate Homeowners Assn. v. Staben* (2006) 144 Cal.App.4th 740, 745 ["""In determining whether plaintiff's evidence is sufficient [for purposes of nonsuit], the court may not weigh the evidence or consider the credibility of witnesses"""].) The only explanation for the trial court's actions is that, in the context of the nonsuit motion, it rendered its decision as an equitable factfinder on

[6] At oral argument, counsel for respondent argued that the court reserved only the issue of Mission's breach for the jury while it reserved the issue of Darbun's breach for itself. This argument was not raised in briefing and has no support in the record. In fact, during the hearing on the nonsuit motion, the court expressed its opinion regarding the futility of requiring Mission to give Darbun an opportunity to cure, which pertained to the issue of Mission's breach.

[7] When the jury rendered its verdict in favor of Darbun, the court entered the jury verdict instead of treating it as an advisory verdict and rendering its own verdict. (See 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 109, p. 140 [verdict by advisory jury is "advisory only" and the court still must make "its own independent findings and to adopt or reject the jury's findings"].)

12

the availability of specific performance.  Regardless, a nonsuit motion was not an appropriate vehicle by which to weigh evidence and make credibility (*McMillin Cos., LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th [a nonsuit motion is evaluated as a matter of law].)

As a result of the trial court's actions, Darbun was deprived of its right to a jury trial and Mission's JNOV motion was erroneously granted.

## A.    Factfinding by the Court

In granting Mission's JNOV motion the trial court stated that it had granted nonsuit on specific performance based on its findings that (1) Darbun had breached the lease and (2) the lease was unenforceable "for lack of material terms."  Because these findings were dispositive and "nothing further remained to be tried by the jury," the court found that there was no substantial evidence to support the jury's finding in favor of Darbun.  We address each issue in turn.

### 1.    *Breach*

The trial court incorrectly believed that it had the authority, under the circumstances of this case, to make factual determinations that were binding upon the jury pursuant to the "equity first" principle.  "It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury [or with an advisory jury], and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury.  [Citations.]"  (*Raedeke*, *supra*, 10 Cal.3d at p. 671.)  Here, however, the court's determination of the equitable issue was not dispositive of the legal issue of breach because the court, on its own, decided to limit the scope of the first phase to *exclude* that issue.  It stated on multiple instances that it did not want to hear evidence of breach during the first phase of trial and sustained objections against testimony that alluded to the issue of breach.  Because it was not acting as the proper factfinder on breach, the court's statements relating to Darbun's breach did not foreclose jury determination on that issue.  The "equity first" rule does not apply in this case.

13

Although a party's deprivation of a right to jury trial is reversible per se (*Selby Constructors v. McCarthy* (1979) 91 Cal.App.3d 517, 527), Darbun suffered actual prejudice as a result of the trial court's misleading and inconsistent statements. Darbun had a right to jury trial on its breach of contract claim, and it never waived that right. (Code Civ. Proc., § 592 [In actions for . . . breach of contract, . . . an issue of fact must be tried by a jury, unless a jury trial is waived"].) The parties proceeded through the first phase of trial, then to jury trial, under the court's assurances that the jury would decide the issue of breach. The court's finding of breach, if it was an actual ruling of the court, improperly usurped an issue that was reserved for the jury, which ultimately found in favor of Darbun. It was not necessary for the court to make a finding on breach in order to decide the availability of specific performance and, as we have discussed, the court had made it clear that it was not doing so.

Had the trial court properly informed the parties of an intention to decide the issue of breach, Darbun would have had the opportunity to preserve its right to a jury trial by abandoning its request for equitable relief and seeking only damages. The absence of equitable claims to be tried would have eliminated the court's right to act as the equitable factfinder, leaving the jury to decide Darbun's legal claims. (See *Raedeke*, *supra*, 10 Cal.3d at p. 671 [plaintiffs properly preserved right to jury trial by abandoning their equitable remedy once trial court announced its intention to try the equitable issues first].) As Darbun was under the impression that the jury, not the court, was the factfinder on breach, it did not have the opportunity to make an "election of remedies in order to secure a trial by jury." (*Ibid.*)

Mission argues that, to the extent the court erred in reaching the issue of breach, it was invited error. Pointing to Darbun's opposition to its motion to bifurcate the trial, Mission claims because Darbun insisted the trial court and jury could simultaneously hear the equitable and legal issues, it is now barred from arguing the court erred by doing so. However, Darbun's appeal does not challenge the trial court's decision to hear both claims simultaneously, but rather the trial court's decision to make factual findings on an issue that it had specifically reserved for the jury. Mission cites nothing in the record that

14

indicates Darbun invited the court to make findings of fact common to its legal and equitable claims once it had specifically reserved the issue of breach for the jury. Further, regardless of whether Darbun's opposition to bifurcation constituted invited error, the trial court did not follow Darbun's suggestion. Instead, it held a separate phase of trial to determine whether specific performance would be *available* as a potential remedy if verdict was rendered in favor of Darbun; it was not held to resolve each element of Darbun's specific performance claim. (See *Chapman v. Enos* (2004) 116 Cal.App.4th 920, 928 [declining to find invited error when trial court did not use allegedly erroneous jury instruction proposed by appellant].) Mission's argument is not well taken.

### 2. *Enforceability*

In granting the motion to expunge the lis pendens, the trial court questioned the enforceability of the lease, stating the "parties had left essential terms regarding the provision of management services and the Defendant's transfer of its skilled nursing license to the Plaintiff to future agreement." Because Darbun had "not address[ed] this issue by directing the Court to evidence that future agreements are not required," the court determined Darbun could not demonstrate the probable validity of its specific performance claim. This finding was incorporated into the trial court's decision to grant nonsuit on specific performance, and was one of the bases upon which the court granted JNOV.

The trial court's finding that an agreement is unenforceable as to specific performance does not necessarily require a finding that it is also unenforceable as to damages. (*S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp.* (1976) 58 Cal.App.3d 173, 180-181 ["[M]any agreements which are not subject to specific performance because of a lack of specificity may nonetheless provide the basis for a damage action"].) This is because agreements that are specifically enforceable require a greater degree of specificity than those subject only to damages. (See Civ. Code, § 3390, subd. (5).)

15

The trial court's finding of unenforceability was made solely within the context of specific performance as a remedy.[8] Darbun does not challenge the court's denial of specific performance, nor does it claim the court abused its discretion in doing so. Given the heightened level of specificity the court must find to order specific performance, paired with Darbun's unexpected change in position regarding the use of Mission's license, it was within the court's discretion to deny that remedy. (*Petersen v. Hartell* (1985) 40 Cal.3d 102, 110 [the decision to award the remedy of specific performance is a discretionary one].) However, the unenforceability finding in equity did not amount to one as a matter of law, because it was based on a weighing of evidence. There was no evidence presented to suggest that the *only* way Darbun could perform its obligations was with Mission's cooperation and use of its operating license; notably, Mission has not refuted Darbun's position that it was possible for Darbun to perform under the lease by obtaining its own operating license.

In sum, the trial court erred when it (1) made a finding on breach after explicitly reserving that issue for the jury, and (2) transformed its finding of unenforceability as to specific performance into a finding of unenforceability as to damages.

### B.    Substantial Evidence to Support Jury Verdict

We now examine the record to determine whether there was substantial evidence to support the jury's verdict in favor of Darbun. "A party is entitled to judgment notwithstanding the verdict only if there is no substantial evidence to support the verdict and the evidence compels a judgment for the moving party as a matter of law. [Citation.] The trial court must view the evidence in the light most favorable to the verdict, disregard conflicting evidence, and indulge in every legitimate inference to support the verdict. [Citation.]" (*Paykar Construction, Inc. v. Spilat Construction Corp.* (2001) 92 Cal.App.4th 488, 493-494.) "On appeal, we determine de novo whether there is

---

[8] The court made statements such as, "[T]his court does not believe it can require the hospital to engage in activities that it did not agree to," and opined that "[t]o do so would require further agreements which the court cannot specifically enforce." It did not say it was making its finding as a matter of law.

16

substantial evidence to support the verdict and whether the moving party is entitled to judgment in its favor as a matter of law.  [Citation.]"  (*Id.* at p. 494.)

### 1. *Notice to Cure*

Darbun argues that, pursuant to the terms of the lease, it cannot be in breach of contract for failure to perform until it receives a notice to cure from Mission and fails to "diligently prosecute[] the cure to completion with dispatch."  Mission argues that it provided a proper notice and opportunity to cure and, in any event, such notice was futile.  (See *Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1186 ["California law allows for equitable excusal of contractual conditions causing forfeiture in certain circumstances, including circumstances making performance futile"].)

Mission's initial termination notice stated the reason for termination was "the failure of Darbun Enterprises to complete the improvements to the Premises within a reasonable time."  The final termination letter states, however, the reason for termination was that Darbun was proceeding under the assumption that it would operate under Mission's license, which Mission did not agree to.

Regardless of what Mission's actual basis for termination was, its original notice to terminate did not afford Darbun an opportunity to cure—a fact Ms. Lennartz acknowledged at trial.  Mission does not explain how Darbun could have cured or "diligently prosecute[d] the cure to completion with dispatch," as allowed by the lease, when it was not afforded an opportunity to do so.  This argument is not well taken.

We are similarly not persuaded by the argument that a proper notice and opportunity to cure would have been futile.  In suggesting that it was not subject to the notice requirement, Mission did not consider the provision of the lease that allowed Darbun to "diligently prosecute[] the cure to completion with dispatch" in the event the alleged failure of performance could not "reasonably be cured within thirty days."  There is no evidence to suggest that Darbun would have refused to diligently address the timeliness of its performance had Mission properly afforded it an opportunity to do so.  As to the licensing issue, Darbun was not aware that

17

this was a basis for termination of the lease until it received the final termination notice. Because Mission does not explain why a notice alerting Darbun that Mission would not obtain an operating license on Darbun's behalf would have been futile, we cannot excuse its failure to provide proper notice on that ground.

For the sake of completeness, we address Mission's remaining arguments that no substantial evidence exists to support the jury's verdict.

### 2. *Evidence of Enforceability*

There was substantial evidence presented during jury trial to establish enforceability of the lease without a future license transfer agreement. Mr. Rupp, Mr. Bunn, and Mr. Sensibile testified that it was possible for Darbun to independently obtain an operating license. Darbun had proceeded under the assumption that Mission would cooperate because it would allow Darbun to start operating earlier, which in turn would allow Mission to collect rent sooner.

Mission argues that testimony should be regarded as inherently incredible because the witnesses directly contradicted their deposition testimony. (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703.) Mission cites *Mikialian v. City of Los Angeles* (1978) 79 Cal.App.3d 150, 159-160 (*Mikialian*) for support, stating that nonsuit was upheld in that case after the plaintiff contradicted his deposition testimony. In *Mikialian*, however, the plaintiff not only contradicted his deposition testimony, but also failed to "reconcile or explain his prior statements" after given an opportunity to do so. (*Id.* at p. 160.) In fact, the *Mikialian* court noted that had plaintiff in that case "explain[ed] the former testimony as a misreporting of his answers, a mistake on his part, or the product of a misunderstanding," such an explanation would have created an issue of the fact for the jury. (*Ibid.*) Darbun's witnesses provided such explanation at trial. We do not consider this testimony to be inherently incredible. (*Stubblefield Construction Co. v. City of San Bernardino*, *supra*, 32 Cal.App.4th at p. 703.) Even if this explanation at trial could have been considered contradictory to the deposition testimony of Darbun's witnesses, the jury was entitled to credit the trial testimony.

18

### 3.    *Evidence of Performance at Reasonable Pace*

Darbun presented substantial evidence to show performance of its obligations under the lease at a reasonable pace.  The parties entered into the lease in October 2006 and Darbun immediately sought a parking variance—something both parties agreed was necessary to Darbun's performance.  The variance was not granted until November 2007.  The parties stipulated this 13-month waiting period was a reasonable amount of time.  Mission terminated the lease 11 months later.  Darbun presented evidence that it faced a significant obstacle because a moratorium had been placed on new long term acute care units, forcing Darbun to pursue development of a skilled nursing facility instead.  Nevertheless, in December 2007, Darbun retained an architect who prepared preliminary plans and submitted them to OSHPD.  Darbun's witnesses explained these plans omitted any structural, mechanical, or electrical specifications because Darbun wanted to ensure its proposal would be acceptable to OSHPD before investing additional time and resources into the project.  The plans were reviewed and returned by OSHPD in February 2008 for "further work," which Ms. Lennartz testified was a typical course of events.  Darbun resubmitted their plans to OSHPD in October 2008.  There was substantial evidence to support the finding that Darbun was performing its obligations within a reasonable timeframe.[9]

### 4.    *No Assignment by Darbun*

Mission argues Darbun was in breach of the lease's prohibition against assignments because D.E.I. was paying for development of the North Tower.  Mission relies heavily on Mr. Sensibile's deposition testimony that "Mr. Bunn, at some point . . .

---

[9] As evidence of unreasonable performance, Mission points to the testimony of Mr. Sensibile, who testified that an additional three to four years would be required, from the time of termination, to complete the project.  This cannot constitute evidence of Darbun's alleged breach because it was an estimated timeline of Darbun's *future* performance.  The basis of Mission's termination of the lease was based on Darbun's *current* performance.  Thus, only Darbun's performance within the two-year timeframe of the date of the signing of the lease to the date of termination is relevant to our analysis.

19

transferred the activities of Darbun to D.E.I. HealthCare." Despite this testimony, however, there was substantial evidence presented at trial to show that Darbun had not violated the lease's prohibition against assignments or subleasing.

Mr. Sensibile's trial testimony clarified that Darbun was the entity pursuing the the lease, while "the bills" were being paid by D.E.I. On cross-examination, he denied denied that D.E.I. became the "operative entity" that was pursuing the lease and its activities. There was no evidence to suggest D.E.I. would assume the obligation to pay to pay rent and operate the North Tower in Darbun's stead. Regardless of Mr. Sensibile's deposition testimony suggesting otherwise, especially in light of the clarification he gave at trial, we find substantial evidence to support the jury's finding that Darbun did not violate the lease's prohibition against assignments or subleasing.[10] (*Kephart v. Genuity, Inc.* (2006) 136 Cal.App.4th 280, 291 [in reviewing a JNOV ruling, courts view the record "in a light most favorable to the verdict, resolving all conflicts in the evidence and drawing all reasonable inferences in favor of the verdict"].)

Mission also contends Darbun did not suffer damages because the expenses related to development of the North Tower were paid by D.E.I., not Darbun. However, Darbun's witnesses testified to a line of credit agreement between D.E.I. and Darbun, by which D.E.I. agreed to undertake payments on behalf of Darbun to develop the property, and Darbun agreed to repay D.E.I. Mr. Bunn, who controls both entities, explained this was necessary because Darbun was subject to an annual government audit and it would raise "unnecessary complication[s]" to have nonoperational expenses on Darbun's books. Ultimately, Darbun was responsible for the expenses paid on its behalf by D.E.I.

---

[10] Mission argues the lease's nonassignability provision "was material, in part because it was tied to Mission's indemnification rights." However, the Supreme Court has acknowledged that a "lessor's interests are . . . protected by the fact that the original lessee remains a guarantor of the performance of the assignee." (*Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 502.) Thus, even if the lease had been assigned to D.E.I. Healthcare, Darbun would have remained a guarantor of D.E.I. Healthcare's performance.

20

Similarly, Mission argues Darbun failed to present any evidence of performance, since the only demonstrated performance was by D.E.I. This argument is not supported by the record. While the architect was retained by D.E.I., trial testimony shows Darbun would have to reimburse D.E.I. for those expenses. The record also indicates Darbun was the entity performing under the contract. For example, correspondence to and from Mr. Sensibile pertaining to the project was sent and received in his capacity as a representative of All Saints Healthcare, a dba of Darbun. Trial testimony indicated Darbun was the intended operating entity, and Darbun, not D.E.I., was "pursuing the lease."

Mission was not entitled to a judgment in its favor as a matter of law.[11]

## II

After the jury verdict, Mission filed a motion to set aside judgment and enter new judgment to be considered by the court in the event its JNOV motion was denied. In that motion, Mission asked that the trial court set aside the judgment for Darbun in the amount of $294,801.04 and enter judgment for Darbun in the amount of $269,699.79 because "the uncontroverted evidence [did] not support the jury's damage award." The trial court deemed the motion moot when it granted Mission's JNOV motion. Because we reverse the trial court's decision to grant JNOV, we direct the trial court to reinstate the jury's verdict, enter judgment in favor of Darbun, and rule on Mission's motion to set aside judgment and enter new judgment. We express no opinion as to the validity of that motion.

---

[11] Because we find substantial evidence to support the jury verdict, we need not consider Darbun's argument that the trial court improperly relied upon motive evidence that it had previously ruled inadmissible.

21

## DISPOSITION

The judgment in favor of Mission is reversed and the case is remanded to the trial court to rule on Mission's motion to set aside judgment and enter new judgment.  Darbun is entitled to its costs on appeal.

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>


            EPSTEIN, P. J.

We concur:


MANELLA, J.         COLLINS, J.