Filed 4/4/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| RELIANT LIFE SHARES, LLC, | B305544 |
| Plaintiff, Cross-defendant and Appellant; | |
| | Los Angeles County |
| SEAN MICHAELS et al., | Super. Ct. No. BC604858 |
| Cross-defendants and Appellants; | |
| PB CONSULTING #2, LLC, et al., | |
| Appellants, | |
| v. | |
| DANIEL B. COOPER et al., | |
| Defendants, Cross-complainants and Respondents. [And four other cases.*] | |

APPEALS from amended judgments and orders of the Superior Court of Los Angeles County. Huey P. Cotton, Judge. Affirmed.

Walton & Walton, L. Richard Walton and Javad Navran for Plaintiff, Cross-defendant and Appellant Reliant Life Shares, LLC.

---

\* *Reliant Life Shares, LLC v. Cooper* (No. B305946); *Reliant Life Shares, LLC v. Cooper* (No. B308884); *Reliant Life Shares, LLC v. Cooper* (No. B309686); *Reliant Life Shares, LLC v. Cooper* (No. B313602).

Grignon Law Firm, Margaret M. Grignon, Anne M. Grignon; Winget Spadafora Schwartzberg, Timothy W. Fredricks and Jared M. Ahern for Cross-defendants and Appellants Sean Michaels and PB Consulting #1, LLC.

Law Offices of Christopher M. Stevens and Christopher M. Stevens for Cross-defendant and Appellant Scott Grady.

Beitchman & Zekian, David P. Beitchman and Paul Tokar for Appellants PB Consulting #2, LLC and 18LS Holdings, LLC.

Beitchman & Zekian, David P. Beitchman and Paul Tokar for Appellant Romelli Cainong, as Trustee for 2007 Irrevocable Octopus Trust, RLM Trust, and 2007 Irrevocable MMA Trust.

California Appellate Law Group and Complex Appellate Law Group, Rex S. Heinke and Jessica Weisel for Defendants, Cross-complainants and Respondents.

―――――――――――――――

**SUMMARY**

Reliant Life Shares, LLC (Reliant or LLC) was a profitable limited liability company owned in equal parts by three members. Two of them, Sean Michaels and Daniel Cooper, were longtime friends and business partners. After Cooper stopped working out of the offices of Reliant because of a medical condition, no one at Reliant expected him to return to work, but Michaels assured Cooper he remained a loyal business partner. Before long, however, Michaels and the third member of Reliant, Scott Grady, tried to force out Cooper, splitting the company's profits and other revenues 50/50 and paying Cooper nothing.

This violated the LLC's operating agreement in multiple ways. Nonetheless, the LLC sued Cooper, seeking a declaratory judgment that he was properly removed as a member of the LLC.

2

Cooper cross-complained against Michaels, Grady and the LLC, alleging breach of contract, fraud, breach of the duty of loyalty and several other causes of action, seeking damages, an accounting and imposition of a constructive trust over funds obtained through violation of fiduciary duties. (We sometimes refer to Reliant, Michaels and Grady as the Reliant parties.)

At the behest of the Reliant parties, the equitable issues—the LLC's request for declaratory relief and Cooper's request for an accounting and constructive trust—were tried first, at a 12-day bench trial (phase one). At the close of that trial, the court concluded, among other things we relate *post*, that the efforts to remove Cooper were improper. As the court put it, "It's not even a close call."

The court found Cooper remained a current one-third owner of the LLC and was entitled to receive one-third of all monies paid to the other two members since November 2013. The court set a January 1, 2019 valuation date, as of which the value of Cooper's equity interest in the LLC would be determined. The court also ordered an accounting, and ultimately imposed a constructive trust over certain assets to compensate Cooper for millions of dollars wrongfully transferred from the LLC to Michaels and Grady. The court further found Michaels and Grady used the LLC and certain trusts and other entities they controlled as extensions of themselves, and concluded the LLC and the other entities and trusts were alter egos of Michaels and Grady. (The court later observed Michaels and Grady "used the corporate coffers of Reliant as their own personal piggy banks.")

A nine-day jury trial (phase two) ensued on Cooper's claims against Michaels and Grady for breach of contract, fraud, breach of the duty of loyalty, aiding and abetting breaches of common

3

law duty (as to Grady), and fraudulent transfer. The jury was instructed that the court's findings of fact and conclusions of law entered in phase one of the bifurcated trial were binding on the second phase of the trial, and these were submitted to the jury in the second phase.

The jury awarded Cooper $6,028,786 in damages (as we describe further, *post*), and in an advisory verdict, valued Cooper's equity interest in the LLC as of January 1, 2019, at $5.7 million. The court ultimately found the value of Cooper's interest in the LLC to be $4.2 million, and awarded that amount in damages jointly and severally against Michaels, Grady and their respective entities. (The parties refer to this award as "buyout damages.") The jury also awarded punitive damages of $500,000 against Grady and $1,001,000 against Michaels. We will describe the judgment, which was amended twice to name additional judgment debtors, in more detail later.

The LLC, Michaels, Grady, and several of their entities appealed. They assert a multitude of arguments for reversal of the judgment. Principal among them are that the trial court's findings in phase one exceeded the scope of the equitable issues and deprived Michaels and Grady of a jury trial on legal claims; the jury instructions and verdict form erroneously made phase one findings binding in phase two; the buyout damages were legally unauthorized; the alter ego findings were impermissible and based on reverse veil piercing; and the punitive damages should be reversed for failure to present evidence of Michaels's and Grady's current net financial condition. There are also claims of error in the award of prejudgment interest, and claims of error relating to the constructive trust. There are claims that a settlement agreement between Michaels and Cooper in another

4

case barred any tort liability or constructive trust remedy. There are claims that the motion to amend the judgment to add the trustee of several trusts as an alter ego judgment debtor was an improper motion for reconsideration, and a claim of improper service on the trustee.

We find no merit in any of the claims and affirm the judgment in full.

## FACTS

### 1.    The Parties and Others

Reliant is the plaintiff in the declaratory relief action against Cooper. Cooper cross-complained against Reliant, Michaels, Grady, and other cross-defendants, including Andrew Murphy, whom Michaels and Grady hired as Reliant's chief executive officer in 2015; Joel Kleinfeld, who held Grady's interest in the LLC for some period of time; and PB Consulting #1, LLC (later found to be an alter ego of Michaels). Murphy and Kleinfeld are not parties to these appeals; the jury found no liability on their part.

Cooper's interest in Reliant is held by a trust of which his father, Richard Cooper, is trustee and who is also a party to this action. We refer to both of them in the singular as Cooper.

The court found several trusts and other entities to be alter egos of Michaels and Grady. The "Michaels entities" are PB Consulting #1, LLC; PB Consulting #2, LLC; the 2007 Irrevocable Octopus Trust; the 2007 Irrevocable MMA Trust; the RLM Trust; and 18LS Holdings, LLC. The "Grady entities" are LaForce Holdings, LLC; Tristan Capital, Inc.; the RLS Trust; and the SLG Trust.

Named as additional judgment debtors in the second amended judgment in one or more causes of action are the three

Michaels limited liability companies listed above and Grady's LaForce Holdings, LLC. The third amended judgment named Romelli Cainong, as trustee for the three Michaels trusts listed above, as additional judgment debtors.

## 2. Outline of Significant Facts

We outline pertinent facts that are undisputed or were found by the trial court. (Unless otherwise identified, items in quotation marks are taken directly from the trial court's fact findings.) *No appellant argues on appeal there is not substantial evidence to support the trial court's findings*, other than the alter ego findings. We will augment this outline as necessary in connection with our discussion of the claims of error made on appeal.

### a. The background

Reliant was formed in 2011. Reliant buys life insurance policies from purchasers who can no longer afford to pay the premiums and then sells these policies in fractional shares to investors, who are paid a share of the policy proceeds when the insured dies. Reliant describes its business as "brokering fractional shares in life settlement policies to qualified customers."

Michaels and Cooper were longtime friends who had multiple business ventures together in the insurance industry. Michaels and Cooper joined Reliant in 2011, jointly taking a majority interest. As of April 2012, the members of Reliant were Monaco Holding Company, Inc. (jointly owned by Michaels and Cooper) with 51 percent and Joel Kleinfeld with 49 percent. Kleinfeld's ownership interest was held on behalf of Scott Grady; Kleinfeld did no work for Reliant while he was an owner. As of December 2012, Monaco owned two-thirds and Kleinfeld one-

6

third. Michaels and Cooper "agreed that Sean Michaels would focus his efforts on Reliant's day-to-day business while Daniel Cooper would focus his efforts on other shared business endeavors."

### b. Events in 2013

"In August 2013, Daniel Cooper stopped working out of the offices of Reliant because of a medical condition." "After Daniel Cooper's August 2013 departure from Reliant, there was no expectation by any member or employee of Reliant that Daniel Cooper would return to work at Reliant's offices." Michaels sent Cooper an e-mail in August 2013 saying that "even though we have our disagreements, I still am 1000% loyal to you as a business partner."

Sometime in 2013, Michaels and Cooper negotiated the separation of the many business interests they held jointly. One of the terms of their separation agreement (about which there is more later) was that Monaco would be dissolved, and Cooper and Michaels would each have a one-third interest in Reliant, the other one-third remaining with Kleinfeld. "Cooper acquired his individual one-third interest in Reliant on November 5, 2013."

Under the terms of the separation agreement, the effective date of which was December 31, 2013, "Michaels agreed to run the day-to-day business of Reliant while Cooper would maintain a one-third ownership interest." The agreement stated Michaels was entitled to a year-end bonus of $50,000 "as compensation for his role as Manager of Reliant." Michaels was appointed manager of Reliant as of November 2013.

The trial court found that Michaels and Grady "began conspiring to remove Daniel Cooper from Reliant beginning as early as August 2013."

### c. The Reliant operating agreement

Reliant is governed by an operating agreement. The operating agreement "did not require Daniel Cooper to spend any time working for Reliant in order to maintain his one-third ownership interest in Reliant and to receive all of its benefits, including one third of Reliant's profits." The operating agreement had several pertinent provisions.

The agreement required Reliant's profits and losses to be allocated in accordance with each member's percentage interest. It required copies of Reliant's financial statements, quarterly and year-end, to be given to all members. It allowed each member to inspect and copy books of account of the company's business, on reasonable notice. (The separation agreement between Michaels and Cooper also contained obligations to provide Cooper with quarterly accountings of Reliant's finances and "access to all financial information when requested.") The operating agreement provided that company decisions required consultations with all members followed by agreement among a majority of members, and in the case of formal meetings, required notice to members.

The operating agreement contained provisions governing transfers of membership interests. These included a provision identifying events with respect to a member that would trigger an option right in Reliant and the other members to purchase that member's interest. Until February 2015, these triggering events were events such as death, incapacity, bankruptcy, failure to make capital contributions, and the like.

The operating agreement also provided procedures for exercise of the option to purchase a member's interest upon the occurrence of a triggering event. These included an attempt to

8

agree on the valuation (the "fair option price"), failing which three appraisers were to be appointed under specified procedures and timelines to determine the fair option price.

### d.     Events in 2014 and 2015

Before January 2014, Michaels, Grady and Cooper "all received equal member monetary distributions from Reliant."  In January 2014, Michaels and Grady "agreed, without any notice to Cooper, that Reliant would stop paying member distributions to Cooper."  Cooper "was not consulted about, nor given notice of, the January 2014 decision to stop paying member distributions to him."

In April 2014, Reliant hired Andrew Murphy as its new CEO.  Murphy replaced Michaels as Reliant's manager.  Cooper was not consulted about these decisions either.

In June 2014, Michaels and Grady "agreed, without notice to or consultation with Daniel Cooper, to pay themselves each approximately $485,000 in back pay and a 3% commission on all of Reliant's sales, regardless of whether they participated in those sales."

Cooper "was not provided with notice of any Member Meetings that took place in 2014 or 2015, as required under Reliant's Operating Agreement."  Nor was he provided with quarterly or year-end financial statements, as also required.

According to Michaels, an offer to buy out Cooper's interest in Reliant was made in the summer of 2014, but Cooper wanted to get an appraisal firm to review the books.  Cooper hired an accounting firm, Hersman Serles, to help him analyze Reliant's financials.  "Hersman Serles could not complete its analysis of Reliant's financials because Reliant failed to provide Hersman

9

Serles with accurate, reliable, and complete financial information."

"On November 5, 2014, Andrew Murphy, on behalf of Reliant, communicated to Cooper an offer to acquire Cooper's one-third membership interest that did not include any cash component. The offer also threatened to impose tax liability on Cooper if he refused the offer." In response to Murphy's offer, Cooper requested certain information about Reliant's finances that had not been provided to him, but Reliant did not comply with his request.

In February 2015, Michaels and Grady purported to adopt Reliant's third amended operating agreement. They amended the agreement to include as a triggering event a "determination by the Majority of Members that another Member should surrender his Membership Interest for the best interest of the Company." Cooper was not consulted about this change, and was not provided with notice of the attempt to change the operating agreement.

In March 2015, Cooper retained RGL Forensics to conduct a forensic accounting of Reliant "because Reliant, Michaels, Murphy, and Grady failed to provide Cooper with full and complete access to Reliant's books and records." Reliant provided RGL with two "materially different versions of its QuickBooks files, the most recent of which included altered historical data." RGL concluded, among many other points, that Michaels, Grady and related entities received total outflows from Reliant of approximately $3.7 million between 2012 and August 2015; Reliant's financial statements understated revenues by approximately $3.8 million between 2013 and 2015; and Reliant was significantly more profitable than reported.

10

On November 12, 2015, a member meeting took place at which Michaels and Grady voted to approve the termination of Cooper's ownership interest in Reliant. This vote constituted a triggering event as defined in the third amended operating agreement that Michaels and Grady purportedly adopted without Cooper. Cooper was not given notice of the November 12, 2015 meeting.

On November 19, 2015, Reliant sent Cooper a letter which "constituted a Notice of Triggering Event under Reliant's Operating Agreement." The operating agreement gives the parties a maximum period of 105 days to establish the fair option price of a member's interest, a period that would end on March 3, 2016. (The parties have 40 days from the option date (receipt of notice of a triggering event, here November 19, 2015) to appoint their appraisers, who then have an additional five days to choose a third appraiser, and the three appraisers must determine the fair option price within 60 days after the appointment of the third appraiser.)

Reliant filed this lawsuit on December 21, 2015, only 32 days after its notice of triggering event, alleging among other things that Cooper refused to disclose the identity of his appraiser, making it impossible for the two to select a third and provide the valuation contemplated by the operating agreement.

"Reliant and its principals never paid anything to acquire Cooper's one-third interest in Reliant." Cooper "did not engage in any behavior that was disruptive to Reliant's business operations at any point in time after August 2013."

### e.    Other pertinent facts and events

In 2016, after the efforts to terminate Cooper's ownership interest, Reliant started paying member distributions to Grady

11

and Michaels.  "Grady regularly used Reliant's company credit card for personal expenses."  "Michaels ensured that he was paid whatever Grady was paid.  This included receiving payment to compensate him equally for personal expenses that Grady charged to Reliant's company credit card."  "When Michaels reduced his workload at Reliant, he was still paid the same amount of money as Grady."

In February 2018, Michaels sold his interest in Reliant to Grady for at least $1.5 million.  "Michaels also received consideration in the form of Reliant writing off a $404,000 loan that Michaels had previously received from Reliant.  Reliant also agreed to pay Michaels' legal bills in this action."  (In its ruling denying judgment notwithstanding the verdict (JNOV), the trial court observed that the deal included an indemnity agreement "by which Reliant/Grady agreed to indemnify Michaels for all damages owed to Cooper," and referred to this transaction as a "sweetheart buyout deal" and a sham.)

"Reliant did not provide Cooper with access to documents underlying transfers from Reliant to Michaels and Grady until April 2018," when Reliant's bookkeeper provided copies of her files in response to a deposition subpoena.

As of December 31, 2018, Michaels and Grady and their respective entities "have received at least $11,724,675.94 in payments and distributions based on their position as owners of Reliant."  Cooper was paid a total of $212,748 by Reliant; the last payment he received was for $10,000 on January 29, 2014.

**f.    The Friwat policy and the "tails"**

Michaels, through PB Consulting #2, LLC, was the owner of a $5.4 million policy issued by Lincoln National Life Insurance Company (Lincoln National), insuring the life of Salim Friwat.

"PB Consulting 2, LLC was established solely for the purpose of investing in the Friwat Policy." "Money from Reliant was used to invest in and pay the premiums on the Friwat Policy."

"Tails" are policies that investors have forfeited to Reliant by failing to pay the premiums after purchasing the policies from Reliant. "18LS [Holdings], LLC, an entity owned by Michaels, Grady, and Luke Walker, own[ed] forfeited and unsold portions (the 'Tails') of life insurance policies sold by Reliant. Grady did not pay anything for the tails he received and 18LS [Holdings], LLC paid $1,000 for the entirety of Tails it received." (The tails were later valued at $880,225.98.)

### 3. The Litigation

#### a. The pleadings and phase one of the trial

Reliant's December 2015 complaint for declaratory relief asked for a declaration of the rights and obligations of the parties under the third amended operating agreement, and specifically requested a declaration that Reliant "has acted properly and in a legally enforceable manner" regarding Cooper's membership interest, and that the removal of Cooper's interest "is proper and in the best interests of Reliant." (Reliant also sought damages, including punitive damages, for conversion; the trial court granted nonsuit on that claim.)

In July 2016, Cooper filed an answer and a cross-complaint against Michaels, Grady, PB Consulting #1, Reliant and others, as mentioned above. In addition to breach of contract, fraud and other legal claims, Cooper sought an accounting and imposition of a constructive trust on Reliant's assets obtained by cross-defendants in violation of their fiduciary and contractual obligations.

13

In February 2018, the Reliant parties sought bifurcation of Reliant's declaratory relief claim, and pointed out that Cooper's equitable causes of action for constructive trust and an accounting "are properly bifurcated." Cooper opposed bifurcation. The trial court granted Reliant's motion, ordering that the first phase of the trial would include Reliant's declaratory relief cause of action and Cooper's accounting and constructive trust causes of action.

On January 18, 2019, after closing arguments in the 12-day phase one trial, the trial court announced its tentative ruling for Cooper. "The actions by [Michaels, Grady, and Murphy] in withholding information, and yet demanding an appraisal and analysis and demanding compliance with the operating agreement, or demanding compliance with the partnership law and good faith is just absolutely inconsistent positions for those defendants to take. So no, they did not follow any proper procedures concerning [Cooper's] removal."

The court also ruled Cooper was entitled to costs and fees, and ordered an accounting, but requested further briefing on the constructive trust claim.

On February 4, 2019, the court ordered Lincoln National to hold $3 million of the first proceeds of the Friwat policy pending further order of the court. The Reliant parties and their entities were enjoined from directly or indirectly distributing those proceeds or assigning any portion of the Friwat policy. Reliant was ordered to complete an accounting detailing, among other things, the amount of monies or assets transferred from Reliant to Michaels, Grady, and their respective entities.

On June 27, 2019, the court granted Cooper's request for a constructive trust. The court ordered Lincoln National to

14

transfer to Cooper immediately "an ownership and beneficial interest totaling $2,500,000" of the Friwat policy, in addition to continuing to hold the $3 million of proceeds as previously ordered. The court also ordered the Michaels and Grady entities to transfer ownership of and beneficial interest in the tails to Cooper, with Reliant to pay all premiums associated with the tails.

On August 19, 2019, after Mr. Friwat's death, the court issued an addendum to its earlier orders and ordered distribution of the $10 million death benefit of the Friwat policy. This included distribution of $5,428,666.65 plus interest to the superior court's trust account.

On September 6, 2019, the trial court entered its findings of fact and conclusions of law in phase one. We have described many of the fact findings in part 2, *ante*. As is apparent from those findings, the court concluded Reliant did not act in a legally enforceable manner and did not follow the proper procedure for removing Cooper as a member. Reliant and its manager failed to provide Cooper with sufficient time to appoint an appraiser, instead filing this suit eight days before Cooper was required to appoint an appraiser, violating the operating agreement. "As a result, Daniel Cooper remains a current 1/3 owner of Reliant, and is entitled to receive one-third of all monies paid to Michaels and Grady from November 2013 through the present."

Other conclusions were as follows.

The court found Reliant violated its obligations to provide Cooper with accurate and reliable financial information as required by the operating agreement. "Based on its willful disobedience and violation of the Operating Agreement, Reliant is estopped from attempting to enforce the provisions of the

15

Operating Agreement at the time that it sought to terminate Daniel Cooper's ownership interest."

As mentioned earlier, the court set the valuation date "for any analysis of Cooper's interest in Reliant" as January 1, 2019. The court awarded attorney fees and costs under the operating agreement of $1,021,620.42.

Because the Reliant parties "actively interfered with the efforts of consultants working on Daniel Cooper's behalf to acquire" financial information to which Cooper was entitled under the operating agreement, the court stated it had ordered a court-appointed third party accountant to provide an accounting "detailing the amount of money transferred from Reliant to Michaels, Grady, or their respective entities," as well as other specified items, including information on the value of the tails and the total amount of personal credit card charges Grady processed using Reliant's corporate credit card.

The court made alter ego findings (discussed *post*), and imposed a constructive trust as described above "[t]o compensate Cooper for monies wrongfully transferred from Reliant to Grady and Michaels."

On November 13, 2019, the trial court denied a motion by Michaels and PB Consulting #1 to vacate the court's findings on the ground the findings violated the right to jury trial.

### b. Phase two of the trial and the jury verdict

As mentioned at the outset, a nine-day jury trial began on December 10, 2019, on several of Cooper's legal claims against Michaels and Grady. The jury was instructed that the court's findings of fact and conclusions of law in the first phase were binding in the second phase, and pertinent findings were also contained in the jury verdict form.

16

On December 20, 2019, the jury found as follows.

In an advisory verdict, the jury valued Reliant at $17.1 million as of January 1, 2019, and found the value of Cooper's equity interest to be $5.7 million.

The jury awarded Cooper $6,028,786 in damages for breach of the operating agreement, and found Grady and Michaels each caused 50 percent of the total damages.  The jury awarded the same amount against Michaels for breach of the separation agreement with Cooper.

On the cause of action for fraud, the jury found against Michaels and Grady, and awarded $2,743,626 against each of them.  The jury also found that Michaels acted with malice, oppression, or fraud justifying an award of punitive damages.

On the cause of action for breach of the duty of loyalty, the jury found against Michaels and Grady, and awarded damages of $3,014,393 against each of them.  The jury found both of them acted with malice, oppression, or fraud justifying an award of punitive damages.

The jury found against Grady on the cause of action for aiding and abetting breaches of common law duty, and awarded damages to Cooper of $6,028,786.

On the fraudulent transfer causes of action against Grady and Michaels, respectively, the jury found each of them transferred monies or assets from Reliant to himself and/or his respective entities for inadequate consideration, and awarded damages of $146,667 against each of them.

Cooper presented no further evidence on punitive damages, relying on the evidence already presented to the jury.  The court instructed the jury, and the jury then awarded punitive damages of $500,000 against Grady and $1,001,000 against Michaels.

17

### c.     The judgment and amended judgments

At a January 29, 2020 hearing on the proposed judgment, the court stated it would set the valuation of Cooper's one-third interest at $4.2 million. The court stated that, "with respect to the valuation, I think I'm certainly within my equitable powers to—especially given the fraud . . . judgment—to order the buyout of Mr. Cooper's interest at the 4.2 million." Cooper submitted an amended proposed judgment, and on March 6, 2020, the trial court entered the "Amended Judgment."

The March 6, 2020 amended judgment determined Reliant, Michaels and Grady were jointly and severally liable for the $4.2 million valuation amount, plus prejudgment interest of $494,794.52, in exchange for the transfer of Cooper's ownership interest in Reliant. After eliminating duplicative damages, the court awarded monetary damages on Cooper's legal causes of action of $6,028,786, plus prejudgment interest of $1,492,747.98, jointly and severally against Michaels, Reliant and Grady.

The judgment awarded punitive damages (as above) and attorney fees, and included alter ego findings and the constructive trust provisions previously ordered. The court ordered the $5.4 million from the Friwat policy to be disbursed to the trust account of Cooper's counsel, and set the order in which the funds were to be applied (various attorney fees, the valuation amount, and so on).

Michaels filed a motion for JNOV and for a new trial on all issues tried to the jury. The trial court denied the motion for JNOV (except on points not relevant to these appeals), but granted Michaels a partial new trial limited to the amount of the punitive damages award.

18

On October 6, 2020, the court entered the second amended judgment, adding PB Consulting #1, LLC; PB Consulting #2, LLC; 18LS Holdings, LLC; and LaForce Holdings, LLC, as additional judgment debtors.

On May 12, 2021, the court entered a third amended judgment, finding the trustees of three Michaels trusts (the 2007 Irrevocable Octopus Trust, the RLM Trust, and the 2007 Irrevocable MMA Trust), Romelli Cainong, and any successor trustees to be additional judgment debtors.

### d.     The appeals

There are four sets of appellate briefs in these appeals, all of which have been consolidated.  Appeals were filed from the judgments and various orders by Michaels and PB Consulting #1, LLC; by Grady and Reliant; by PB Consulting #2, LLC and 18LS Holdings, LLC; and by Romelli Cainong as trustee for the three Michaels trusts.

## DISCUSSION

## 1.     Claims About the Scope of Phase One Findings

The Reliant parties contend the trial court's findings of fact and conclusions of law in phase one exceeded the scope of the equitable issues, depriving them of a fair jury trial on Cooper's legal claims.  Relatedly, they contend the jury instructions and verdict form erroneously made phase one findings binding on the jury, leading to the exclusion of significant evidence and requiring a new trial.  We disagree with both claims.

### a.     The law

The applicable principles appear in *Darbun Enterprises, Inc. v. San Fernando Community Hospital* (2015) 239 Cal.App.4th 399 (*Darbun*), the case on which Michaels primarily relies.

19

"A jury trial is a matter of right in a civil action at law, but not in equity.  [Citation.]  [¶]  'Complications arise when legal and equitable issues (causes of action, requested remedies, or defenses) are asserted in a single lawsuit. . . .  In most instances, separate equitable and legal issues are "kept distinct and separate," with legal issues triable by a jury and equitable issues triable by the court.  [Citations.]'  [Citation.]  The order of trial in these mixed actions has 'great significance because the first fact finder may bind the second when determining factual issues common to the equitable and legal issues.' "  (*Darbun, supra,* 239 Cal.App.4th at p. 408.)

*Darbun* continues:  "Generally, in mixed actions, the equitable issues should be tried first by the court, either with or without an advisory jury.  [Citations.]  Trial courts are encouraged to apply this 'equity first' rule because it promotes judicial economy by potentially obviating the need for a jury trial."  (*Darbun, supra,* 239 Cal.App.4th at pp. 408–409, fn. omitted; see *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 158 [allowing first fact finder's factual determination to bind the second "minimizes inconsistencies," "avoids giving one side two bites of the apple," and "prevents duplication of effort"].)

### b.    Contentions and conclusions

Contrary to Michaels's contention, *Darbun* does not support his claim that the court could not determine that Michaels (and not just the LLC) breached the operating agreement.  We are at a loss to understand how that could be so, given the LLC acts through its members.  Further, the trial court found Reliant and Michaels (and Grady, and their entities) were alter egos of each other (as to which, more *post*).

20

It was the *Reliant parties*, not Cooper, *who sought bifurcation* of the trial.  In seeking bifurcation, they argued that "[t]his court may decide the equitable issues first, and this decision may result in factual and legal findings that effectively dispose of the legal claims.  This is perfectly acceptable."  As the trial court observed in denying Michaels's new trial motion, "all parties agreed this issue [entitlement to ownership and distribution] was to be decided by the court in Phase 1, at least they agreed until the decision was issued."

Michaels insists the court made "myriad factual findings exceeding the equitable claims' scope," citing the court's entire 27-page ruling.  These included the findings that Cooper did not have to spend any time working for Reliant; that Grady and Michaels began conspiring to remove Cooper in August 2013; "setting forth the terms of the Separation Agreement" between Cooper and Michaels; Reliant's failure to pay Cooper monies paid to Grady and Michaels; the attempt to adopt the third amended operating agreement without consulting Cooper; and Grady's obtaining the tails for inadequate consideration.  Michaels tells us that "[n]one of these factual findings were necessary" to adjudicate the equitable claims.

Similarly, Michaels contends the jury should not have been instructed that phase one findings were binding.  These included findings such as that Michaels and Grady did not give notice to or consult with Cooper on paying themselves back pay and commissions; did not give notice of member meetings; did not consult with Cooper on multiple matters; violated the obligation to provide Cooper with accurate and reliable financial information; and so on.  Likewise, Michaels complains that the verdict form stated that Reliant had improperly removed Cooper

21

as a member, itemizing Michaels's conduct (as just recited), and that this "prevented the jury from making any independent breach determination."

First, as for Michaels's contention the fact findings were not "necessary," it was the trial court's prerogative to decide what facts had been proven in support of its equitable judgment. As the court stated in *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 359 (*Orange County*), "All of the trial court's equitable findings were binding on the [plaintiff's] legal claims, regardless of whether they were necessary for the judgment. 'Issues adjudicated in earlier phases of a bifurcated trial are binding in later phases of that trial and need not be relitigated. [Citations.] No other rule is possible, or bifurcation of trial issues would create duplication, thus subverting the procedure's goal of efficiency. [Citation.] "[D]uplication of effort is the very opposite of the purpose of bifurcated trials." ' " (*Id.* at p. 359.)

Second, all the fact findings are relevant either to Reliant's request for a declaration that Michaels and Grady "properly determined that [Cooper] must surrender [his] Membership Interest in the best interests of the Company" and that Reliant "acted properly . . . regarding the membership interests of [Cooper]," or to Cooper's claims for an accounting and a constructive trust—the latter of which requires, among other things, the "*wrongful* acquisition or detention" of an interest in property by one "who is not entitled to it" (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 990 (*Communist Party*)). Michaels's arguments that the court "had no authority to find wrongdoing by Michaels," and that Reliant merely sought a declaration that it had complied with "technical provisions" in the

22

operating agreement and "not a finding of breach" have no merit. The law does not support the Reliant parties' claim they were improperly deprived of a jury trial.

*Orange County* expressly rejected a contention that it was error for the trial court in that case to give preclusive effect to its factual findings in connection with the plaintiff's equitable claims. (*Orange County, supra,* 12 Cal.App.5th at p. 358.) The court explained that, while the plaintiff had a right to a jury trial on legal claims, "this jury trial right is not inconsistent with the further principle that any factual findings made following a bench trial on the [plaintiff's] equitable claims may be binding on its legal claims, and the right is not infringed by its application." (*Id.* at p. 359; see also *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1244 ["Here, the fact that the trial of the equitable issues first resulted in factual findings that implicated the legal claims does not mean that [the plaintiff] was improperly denied the right to a jury trial."].)

The Reliant parties' reliance on *Darbun* does not help. In that case, the court held that, "in cases involving mixed issues of equity and law, a trial court may not act as a fact finder on issues it specifically reserves for jury determination. Here, in granting JNOV, the court improperly transformed its equitable finding of unenforceability as to specific performance into a finding of unenforceability as to the legal issue of damages." (*Darbun, supra,* 239 Cal.App.4th at p. 402.) The court further observed: "The difficulties presented in this case stem mainly from the trial court's inconsistent and misleading statements, which resulted in confusion among the parties and complicated the issues on

appeal." (*Id.* at p. 409; see the next footnote.)[1]  Those inconsistent and misleading statements were the basis for *Darbun*'s conclusion that "a trial court may not act as a fact finder on issues it specifically reserves for jury determination." (*Id.* at p. 402.)  Nothing like that happened here.

The *Orange County* court similarly explains *Darbun*: "*Darbun* found error based on the trial court's 'inconsistent and misleading statements' regarding, among other things, which issues would be decided during the first-phase bench trial. [Citation.]  'The parties proceeded through the first phase of trial, then to jury trial, under the court's assurances that the jury would decide the issue of breach.'  [Citation.]  The trial court subsequently decided the issue of breach, which *Darbun* held deprived the plaintiff of its jury trial right." (*Orange County,*

---

[1]  *Darbun* continued:  "The trial court explicitly stated, on several occasions, that it did not want to hear the issue of breach in the equitable phase of trial—that issue was for the jury to decide.  The only evidence it was interested in during the equitable phase was that which pertained to specific performance.  Yet, it made statements on the record in ruling on nonsuit that Darbun had failed to perform and had breached the contract.  The court also suggested the jury was an advisory jury on breach, but had not treated it as such.  Despite a seemingly dispositive ruling on Darbun's failure to perform, the court then told Darbun, 'If you can get your damages, get your damages' and continued with jury trial.  During the JNOV hearing, the court insisted that its statement pertaining to Darbun's breach was the basis for its decision to grant nonsuit, and that left nothing for the jury to decide." (*Darbun, supra,* 239 Cal.App.4th at pp. 409–410, fns. omitted.)

24

*supra,* 12 Cal.App.5th at pp. 358–359, quoting *Darbun, supra,* 239 Cal.App.4th at pp. 409–410, 411.)

In short, the only pertinent principle from *Darbun*, confirmed in other cases, is that " 'the first fact finder may bind the second when determining factual issues common to the equitable and legal issues.' " (*Darbun, supra,* 239 Cal.App.4th at p. 408.) That is exactly what happened here.

We will not burden this opinion with an explanation why each of the court's fact findings is common to the equitable and legal issues. We have recited those findings, and the connection is apparent. One example will do: Michaels complains that the court should not have found Cooper did not have to spend time working for Reliant, and Cooper was not expected to return to Reliant after August 2013. But the Reliant parties claimed at the bench trial that Cooper abandoned Reliant, justifying the decision to terminate his interest; in closing argument, counsel argued Cooper was equitably estopped from taking the position he had membership rights. It was plainly appropriate for the court to find Cooper was *not* required to work for Reliant, based on the operating agreement and the separation agreement.

Last, Michaels argues the trial court could not make any alter ego findings in phase one. For this assertion, he cites *King v. King* (1971) 22 Cal.App.3d 319, which in turn refers to "the general rule that the judgment must be confined to the issues raised by the pleadings" (and then finding an exception to that principle applied). (*Id.* at p. 324.) *King* does not discuss alter ego principles. The only thing *King* said about alter ego was in a footnote, where the court said the evidence established the defendant completely dominated and controlled the affairs of two

25

business enterprises, and that they were alter egos of the defendant. (*Id.* at p. 328, fn. 5.)

*King* aside, the court acted well within its discretion when it decided alter ego claims in phase one. Cooper's cross-complaint alleged Reliant paid monies to shell business entities associated with Michaels and Grady, and that Michaels and Grady funneled unauthorized payments and withdrawals into shell business entities. These allegations were realleged and incorporated by reference in Cooper's accounting and constructive trust causes of action which the Reliant parties agreed should be tried with all equitable claims in phase one.

## 2.    The Buyout Damages

As mentioned earlier, the court valued Cooper's one-third interest in Reliant at $4.2 million. The judgment found Michaels, Grady and Reliant, as well as additionally named judgment debtors PB Consulting #1, LLC; PB Consulting #2, LLC; 18LS Holdings, LLC; and LaForce Holdings, LLC, jointly and severally liable to pay the valuation amount plus prejudgment interest to Cooper in exchange for the transfer of his ownership interest in Reliant.

The Reliant parties and additionally named judgment debtors contend the buyout damages were legally unauthorized. Their argument is, there was no action for dissolution; an equitable buyout is not a remedy for Cooper's fraud claim; and the buyout damages duplicated the jury's fraud damages. We reject these claims.

First, we reject the Reliant parties' claim that the court had no jurisdiction to order a buyout in the absence of a dissolution action. They say that under the Revised Uniform Limited Liability Company Act (Act; Corp. Code, § 17701.01 et seq.), a

26

dissolution cause of action is "a mandatory prerequisite to a buyout remedy." For this they cite *Kennedy v. Kennedy* (2015) 235 Cal.App.4th 1474, 1485–1487, and the buyout procedure described in Corporations Code section 17707.03, subdivisions (c)(1) through (5). Since none of the pleadings in this case requested a buyout, they say, the trial court could not order one. We disagree.

Corporations Code section 17707.03 does indeed allow a member to file an action for dissolution, in which case the court can decree the dissolution whenever specified events occur. (*Id.*, subds. (a) & (b).) If such a suit is filed, other members may avoid dissolution by purchasing the interest of the member initiating the action, and the statute specifies the procedures for doing so. (*Id.*, subd. (c).)

But nothing in Corporations Code section 17707.03, or in the *Kennedy* case, states or suggests that a court has no equitable power to order buyout damages under other circumstances not involving a member's decision to seek dissolution. The court did not "disregard the Act's requirements"; those requirements simply do not apply here because Cooper did not seek a decree of dissolution, and Cooper did not have to seek a decree of dissolution to obtain buyout damages in this case.

The Reliant parties cite *Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122 for the proposition the court "did not have the equitable power to disregard the Act's requirements." *Marina Tenants* has nothing to do with LLC's or buyouts. The court merely stated the general principle that "a court of equity is without power to decree relief which the law denies." (*Id.* at p. 134.) Nothing in the law forbids the court's action here.

27

Indeed, as Cooper argues, a buyout of Cooper's interest is consistent with the relief Reliant sought in the first place: a declaration that Cooper's membership had been terminated and Reliant's manager could authorize a valuation for the purpose of calculating the fair option price for Cooper's interest. Of course, the results were not what the Reliant parties wanted—but Reliant's complaint was filed to do exactly what the court has now done, and had the equitable power to do. "A court of equity has broad powers and comparatively unlimited discretion to do equity without being bound by any strict rules of procedure." (*Richmond v. Dofflemyer* (1980) 105 Cal.App.3d 745, 766.)

Next, the Reliant parties criticize the trial court's statement, in its ruling denying JNOV, that "[n]othing in Corporations Code Section 17707.03 precludes an equitable buyout as a remedy for fraudulent activity." They say the jury's award of damages for fraud "demonstrates an adequate legal remedy existed," and the trial court "awarded double fraud damages in the guise of buyout damages." We reject this assessment.

There were no duplicative damages awarded. The jury awarded damages for breach of contract ($6,028,786) and for fraud ($2,743,626 against each of Michaels and Grady). The court found the damages for fraud were "duplicative of and included within" the damages awarded for breach of the operating agreement. The court limited the damages award in the phase two trial to $6,028,786. The buyout damages are not fraud damages. The jury's award compensated Cooper for the monies he should have received as distributions as a one-third owner. The court's award of $4.2 million compensates Cooper for

28

his equity interest in Reliant, in return for which he gives up his ownership interest. There is no duplication anywhere.

Finally, Michaels contends he cannot be liable for buyout damages because he was not a Reliant member on the date the court set as the valuation date, i.e., the date as of which the value of Cooper's equity interest in the LLC was determined. (The reader will recall that Michaels sold his one-third interest in Reliant to Grady in February 2018, and the valuation date was January 1, 2019.) This argument goes nowhere either. We agree with the trial court's assessment in its ruling denying JNOV on Michaels's claim that he should not be forced to pay the buyout damages: "Michaels cannot escape liability to Cooper by arguing that he washed his hands of Reliant . . . . Michaels' sweetheart buyout deal between Michaels and Reliant/Grady, that included an indemnity agreement by which Reliant/Grady agreed to indemnify Michaels for all damages owed to Cooper, is relevant to show that the Michaels buyout was a sham. Given the well-established pattern of deception and misdirection employed by Michaels in using various corporate maneuvers in attempts to shield himself from liability to Cooper, it is reasonable to infer that the Michaels buy-out was simply another example of the same."

3.    **The Alter Ego Issue**

The Reliant parties, PB Consulting #1, PB Consulting #2, and 18LS Holdings, contend the trial court's alter ego findings were improper because they were primarily based on reverse veil piercing and were unsupported by the evidence. We see no error.

a.    **The facts**

In its conclusions of law after phase one, the trial court stated: "Here, the evidence established that Michaels utilized

29

Reliant and his entities PB Consulting [1], LLC, PB Consulting 2, LLC, the 2007 Irrevocable Octopus Trust, the 2007 MMA Trust, the RLM Trust, and 18LS [Holdings], LLC (the 'Michaels Entities') as an extension of himself by disregarding corporate formalities, comingling money, and transferring assets without consideration, so much so that Reliant and the Michaels Entities are alter egos of Michaels."  The court explained:

"Michaels exerted such a unity of ownership over Reliant by dictating when payments would be made and how they would be classified without any methodology for doing so, such that there was essentially no separation between Michaels and Reliant.  Michaels also made decisions regarding Reliant without input from Cooper, despite the fact that Cooper was and is a one-third member of Reliant.  Payments to Michaels were casually made without the use of a payroll company.  Further, Michaels artificially manipulated Reliant's books and records by (among other things) reclassifying historical data to negatively impact the perceived profitability of Reliant, to the detriment of Cooper.  Additionally, Michaels authorized transfers from Reliant to himself and to some of the Michaels Entities without regard for whether Reliant was properly capitalized to conduct business on an ongoing basis."

The court reached similar conclusions as to Grady.  "Likewise Grady utilized Reliant and his entities LaForce Holdings, LLC, Tristan Capital, Inc., the RLS Trust, and the SLG Trust (the 'Grady Entities') as an extension of himself, by disregarding corporate formalities, comingling money, and transferring assets without consideration; so much so that Reliant and the Grady Entities are alter egos of Grady."  The

court recited the same facts supporting this conclusion that we have just recited with respect to Michaels and his entities.

### b. Contentions and conclusions

The Reliant parties first contend the trial court's alter ego findings were improper because "outside reverse" piercing of the corporate veil "is not permitted in California." They rely on one opinion, *Postal Instant Press, Inc. v. Kaswa Corp*. (2008) 162 Cal.App.4th 1510 (*Postal Instant Press*) to argue that, while traditional alter ego doctrine allows an individual shareholder to be held liable for claims against a corporation, it does not allow a corporation to be held liable for claims against an individual shareholder. *Postal Instant Press* rejected the "variant of the alter ego doctrine, called third party or 'outside' reverse piercing of the corporate veil," and held that "a third party creditor may not pierce the corporate veil to reach corporate assets to satisfy a shareholder's personal liability." (*Id*. at pp. 1512–1513.)

The opinion in *Postal Instant Press* includes a thorough analysis of cases from California, federal and other state courts discussing "outside reverse piercing of the corporate veil," both cases accepting, and others rejecting that theory of alter ego. (*Postal Instant Press, supra,* 162 Cal.App.4th at pp. 1519–1525.) The *Postal Instant Press* opinion rejected it as "a radical and problematic change in standard alter ego law." (*Id*. at p. 1521.) The opinion explains outside reverse piercing of the corporate veil creates unanticipated exposure for innocent investors and secured and unsecured creditors who relied on the impregnability of the corporate form; and that other remedies are available to the creditor of an individual shareholder, such as enforcing the judgment against the shareholder's assets, including his shares in the corporation. (*Id*. at p. 1524.)

31

In *Postal Instant Press*, the corporation at issue had other shareholders, the plaintiff failed to show that innocent creditors would be adequately protected, and the plaintiff admittedly did not pursue other available legal remedies because it was "simply more expedient" to add the corporation as a judgment debtor. (*Postal Instant Press, supra*, 162 Cal.App.4th at pp. 1524, 1523.) In other words, the equities of the case did not justify disregarding the corporate form.

The facts and governing law in this case are entirely different. We find neither the holding nor the reasoning of *Postal Instant Press* governs the alter ego determination in this case. (See *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 222 ["*Postal Instant Press* does not preclude application of outside reverse veil piercing in this case for several reasons," including that *Postal Instant Press* "was expressly limited to corporations"; "different facts before us, as well as the nature of LLCs, do not present the concerns identified in *Postal Instant Press*"; and "[t]here simply is no 'innocent' member of [the LLC] that could be affected by reverse piercing here"]; see also *Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, 847 ["There is no reason to depart from [*Curci*'s] sound analysis."].) The same is true here, where the entities are closely held and controlled by the individual who engaged in the wrongdoing.

Next, the Reliant parties contend Cooper did not establish "a unity of interest or equitable right to find any entities alter egos of Michaels." (Grady and Reliant join in Michaels's arguments.) Their arguments, however, do not mention the substantial evidence standard of review, or mention substantial evidence at all.

Instead, the Reliant parties make the unsupported assertion that "no liability findings were made against Michaels for which a Michaels entity could be an alter ego." That is clearly wrong, as already discussed (see Discussion, at pp. 25–26, *ante*). Then they say that only trustees, not trusts, can be alter egos. That is a correct principle of law, but a moot one, given that the third amended judgment added the trustees as additional judgment debtors. (The issues raised by the trustees are discussed in part 9, *post*.)

After making the legally meaningless claim there was only "limited evidence" that 18LS Holdings and PB Consulting #2 purchased the Friwat policy and tails from Reliant, Michaels argues that Cooper already received all of the economic interests Michaels or his related entities had in the Friwat policy and the tails by way of the constructive trust the trial court imposed. There is no evidence, Michaels says, that PB Consulting #2 or 18LS had any other assets, "thus mooting any request to add them to the judgment in an alter ego capacity." He cites no authority for this principle. We are unaware of any requirement that the fact or amount of an alter ego's assets must be shown to establish alter ego status.

Michaels makes a similar argument about PB Consulting #1, saying there was no evidence PB Consulting #1 held any of Michaels's assets by the time of the phase one alter ego findings in 2019, and therefore Cooper did not prove an injustice would result absent an alter ego finding. Again, no relevant authority is cited.

We note, and agree with, the trial court's denial of Michaels's JNOV motion on this issue: "There was also substantial evidence, indeed admissions, that Michaels and

33

Grady created shell companies such as PB Consulting LLC (for Michaels) and LaForce Holdings LLC (for Grady) as conduits through which they could funnel money from Reliant to other entities, such as the Friwat policy, for their own benefit. These shell companies were part of the fraud determined by the jury that prevented Cooper from discovering all sums paid to Michaels and Grady." The trial court also stated in its JNOV ruling, that "there was ample evidence that an injustice would result, given that Cooper demonstrated that Michaels and Grady had used the corporate coffers of Reliant as their own personal piggy banks."

PB Consulting #2 and 18LS Holdings separately contend there was no evidence they were undercapitalized, commingled corporate and personal funds, or failed to observe corporate formalities. They also say Michaels was not the sole member of either of them, and there was "no evidence to support any impropriety or funneling of money between Michaels, PB Consulting #2, 18LS, and/or Reliant." That is not accurate. As we have already observed, the trial court expressly found that PB Consulting #2 "was established for the purpose of investing in the Friwat Policy," and "[m]oney from Reliant was used to invest in and pay the premiums on the Friwat Policy." The court further found that 18LS Holdings, "an entity owned by Michaels, Grady, and Luke Walker, own[ed] forfeited and unsold portions (the 'Tails') of life insurance policies sold by Reliant"; and 18LS "paid $1,000 for the entirety of Tails it received." The trial court's alter ego findings are supported by the evidence.

4.     **Punitive Damages**

The jury awarded $1,001,000 in punitive damages against Michaels and $500,000 in punitive damages against Grady. Michaels and Grady both appeal the punitive damages awards.

34

Michaels does not challenge on appeal the trial court's ruling on his JNOV motion except with respect to the court's denial of his motion for JNOV on punitive damages. Michaels argues the court should have granted JNOV on punitive damages, and not just a new trial on the amount of punitive damages. Michaels does not contend there is insufficient evidence to support the jury's finding he was liable for punitive damages. Instead, he argues only that Cooper failed to present evidence of Michaels's current net financial condition.

Grady, who did not file a JNOV motion, likewise contends the award against him was erroneous for the same reason.

### a. The facts

Michaels's counsel sought bifurcation of the trial on punitive damages in the phase two jury trial. Counsel stated there would be evidence in the liability phase of trial of assets and monies being transferred from Reliant to the individual defendants, "[b]ut to the extent that those individual defendants have other means or assets, . . . I don't think those things ought to come in." The court granted the bifurcation motion. It turned out that a considerable amount of evidence was admitted about specific dollar amounts—in the many millions of dollars—that Michaels and Grady looted from Reliant and took as their own personal assets. That evidence, together with the evidence (not challenged on appeal) of their malice, oppression and fraud, was sufficient to support the punitive damages award.

During the liability phase of the trial, the jury was provided with the court's findings, including that Michaels and Grady and their respective entities had received at least $11.7 million in payments and distributions based on their position as owners of Reliant as of December 31, 2018. The jury

35

received considerable evidence of Michaels's and Grady's financial condition.  The jury heard evidence that Michaels and his related entities received at least $4.1 million from Reliant in distributions and other payments as of December 2018; Michaels himself so testified.  The jury heard evidence Michaels formed a new company "to have an empty corporate shell that would be ready to go to replace Reliant in the event . . . we couldn't use it as a business anymore."  Michaels was paid an additional $1.5 million when Grady purchased his interest in February 2018 (in a transaction the trial court characterized as a sham).  The jury saw evidence that Reliant's annual net income for 2017 and 2018 was more than $3 million and $3.2 million, respectively, with more than $13 million in revenue in each year.  The jury knew that Michaels was the owner of a $5.4 million insurance policy benefit (the Friwat policy).

Just before closing arguments in the liability stage of the jury trial (which included liability for punitive damages), counsel for Cooper stated that, "With respect to punitive damages, we want to get this done as soon as possible, and so we don't think we need to present additional evidence for punitive damages.  I don't want to waste the jury's time or the court's time."

After closing arguments, the jury rendered its verdict on each of the causes of action at issue.  Its verdict on Cooper's cause of action for breach of the duty of loyalty included a finding that Michaels and Grady acted with malice, oppression, or fraud justifying an award of punitive damages.  Similarly, the verdict on the fraud cause of action included a finding that Michaels acted with malice, oppression or fraud.

The court then instructed the jury on the factors it should consider in determining the amount, if any, of punitive damages,

including that any award could not exceed the defendant's ability to pay. Neither counsel for Michaels nor counsel for Grady moved for a directed verdict or objected to the court instructing the jury on the amount of punitive damages and submitting the question to the jury on the ground that the evidence of their net worth was insufficient to permit the court to submit the question to the jury.

After a short deliberation, the jury assessed $1,001,000 in punitive damages against Michaels, and $500,000 against Grady.

Michaels sought JNOV, contending the award was not supported by evidence of his current financial condition. The trial court denied Michaels's motion. The court rejected the argument that Michaels's liabilities were not considered, stating the record showed no objections on that basis. The court said there was evidence of certain liabilities, but did not describe that evidence. (Michaels says the only evidence of his current liabilities was his testimony that Reliant had paid his legal fees, about $225,000.) The court observed "[t]here was also evidence of Michaels unchanging practice of using shell companies to funnel money out of Reliant and withholding of essential accounting records of Reliant to reduce any chance of determining Michaels' total income and liabilities."

The court ultimately concluded that, "[t]ogether with all reasonable inferences to be drawn from the evidence, jury had sufficient evidence of Michaels financial condition to make their award."

### b. The law

"A judgment notwithstanding the verdict is proper only when no substantial evidence and no reasonable inference

37

therefrom support the jury's verdict." (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110, italics omitted.)

"[A]n award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109 (*Adams*).) "[A] plaintiff who seeks to recover punitive damages must bear the burden of establishing the defendant's financial condition." (*Id.* at p. 123.)

The Supreme Court has not "prescribe[d] any rigid standard for measuring a defendant's ability to pay." (*Adams, supra,* 54 Cal.3d at p. 116, fn. 7.) "Accordingly, there is no one particular type of financial evidence a plaintiff must obtain or introduce to satisfy its burden of demonstrating the defendant's financial condition. Evidence of the defendant's net worth is the most commonly used, but that metric is too susceptible to manipulation to be the sole standard for measuring a defendant's ability to pay." (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 194 (*Soto*).) "Yet the 'net' concept of the net worth metric remains critical." (*Ibid.*) " 'Thus, there should be some evidence of the defendant's actual wealth' [citation], but the precise character of that evidence may vary with the facts of each case [citations]." (*Id.* at pp. 194–195; see also *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680 (*Baxter*) ["Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income."].) "The evidence should reflect the named defendant's financial condition at the time of trial." (*Soto,* at p. 195.)

### c.     Contentions and conclusions

As mentioned, Michaels and Grady contend there was no meaningful evidence of their personal financial condition at the time of trial.  We disagree.

As just related, *Soto* tells us that the "precise character" of the evidence of actual wealth "may vary with the facts of each case" (*Soto, supra,* 239 Cal.App.4th at pp. 194–195), and *Baxter* tells us that "[n]ormally," evidence of liabilities should accompany evidence of assets (*Baxter, supra,* 150 Cal.App.4th at p. 680).  But there is nothing "normal" about the facts of this case.  The jury heard evidence of millions of dollars Michaels and Grady funneled from Reliant to themselves and the entities they owned; evidence of Grady's extravagant lifestyle, with purchases of luxury cars, expensive jewelry, renting a mansion for $20,000 a month, and the like; evidence of Reliant's multimillion dollar net income for 2017 and 2018; and evidence of Michaels "withholding of essential accounting records of Reliant to reduce any chance of determining Michaels' total income and liabilities."

Michaels and Grady cite cases like *Baxter,* where the court held the plaintiff "failed to present meaningful evidence of [the defendant's] liabilities, or other evidence, that would indicate her ability to pay a punitive damage award."  (*Baxter, supra,* 150 Cal.App.4th at p. 681.)  The record in *Baxter* showed the defendant owned substantial assets, but was "silent with respect to her liabilities."  (*Ibid.*)  The assets were real properties, but there was no evidence whether they were encumbered or whether they generated a profit.  (*Ibid.*)  In contrast (and as the trial court observed), here "the assets that the jury considered were cash assets and could not have been encumbered in the way real property is."  In *Soto,* the court, citing *Baxter,* said the record

39

showed that the defendant company "earned substantial revenues from one of its business lines, but is silent in all other respects." (*Soto, supra,* 239 Cal.App.4th at p. 196.) Here, the record showed Reliant, alter ego of Michaels and Grady, earned millions in net income in 2017 and 2018.

Michaels cites other cases as well. He describes *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 56–57 as finding in that case the "profit defendant reaped from fraud [was] not evidence of defendant's entire financial picture." That description fails to fully capture the court's discussion. The court observed the punitive damages award was "based solely on high paper profit from the fraudulent transaction," and stated further that "[w]e know from the facts of this case that the defendants were in difficult financial straits, juggling balance sheet items in the millions of dollars." (*Id.* at p. 58.) There are no such facts here.

Michaels cites *Lara v. Cadag* (1993) 13 Cal.App.4th 1061. In *Lara,* the court held that "where, as here, the evidence is limited to proof of the defendant's annual income, there is insufficient evidence to support an award of punitive damages." (*Id.* at p. 1063.) And Michaels cites *Farmers & Merchants Trust Co. v. Vanetik* (2019) 33 Cal.App.5th 638 (*Farmers*), where the court made the general statement that "[w]e may not infer sufficient wealth to pay a punitive damages award from a narrow set of data points, such as ownership of valuable assets or a substantial annual income." (*Id.* at p. 648.) These cases are not instructive because here, the record is not limited to only a narrow set of data points on an individual's annual income or on mere ownership rights in valuable assets.

We find more instructive *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, where the

court found evidence of large revenues and the ability to borrow demonstrated a corporate defendant's ability to pay a $300,000 punitive damages award, despite reporting a negative net worth of $6.3 million. (*Id.* at pp. 579–580.) The corporation's net worth calculation included accumulated depreciation of approximately $4.9 million and a note to the sole shareholder of $6 million. (*Id.* at p. 583.) "Although this represents a loss for accounting purposes, it did not impact [the defendant's] ability to pay a damage award as would, for example, salary and wage expenses." (*Ibid.*) The defendant had $2.2 million cash on hand; a checking account balance of over $19 million; and a $50 million line of credit. (*Id.* at pp. 580, 583.) The court affirmed the award "[c]onsidering the large volume of [the defendant's] revenues, the ease with which net worth is subject to adjustment . . . , and the fact that [the defendant] had the capacity to borrow $50 million . . . ." (*Id.* at p. 583.)

In short, the cases demonstrate the pertinence of *Soto*'s observation that the "precise character" of the evidence of actual wealth "may vary with the facts of each case." (*Soto, supra,* 239 Cal.App.4th at pp. 194–195.) Here, there was little evidence of the defendants' personal liabilities, but a lot of evidence of the profitability of their alter ego Reliant and the millions of dollars of revenues they received (and in Grady's case, continues to be entitled to receive as owner of Reliant). Given their efforts throughout to funnel revenues through shell companies and withhold accounting records (as the court found and the jury was aware, "a constantly evolving method for Michaels, Grady, and others to receive cash outflows from Reliant"), we think the jury could reasonably infer their ability to pay the relatively modest

awards of punitive damages. Neither Michaels nor Grady was entitled to JNOV on the punitive damages award.

## 5.    The Claim of Excluded Evidence

Grady and Reliant contend the trial court improperly excluded evidence and argument to the jury that Cooper breached his obligation of good faith and fair dealing, and his duty of care to Reliant and its members, under Corporations Code section 17704.09, subdivisions (c) and (d). This is because, according to Grady and Reliant, Cooper "concealed an appraisal he was required to exchange during the buy-out process, thwarting and obstructing the process and making the appointment of the third appraiser . . . impossible," and the jury "was improperly deprived of that information." The court "compounded that error," they say, by binding the jury to its findings that the operating agreement did not require Cooper to spend any time working for Reliant to maintain his ownership and receive one-third of its profits, and there was no expectation Cooper would return to work after August 2013.

These contentions are without merit. The claim about Cooper's concealing an appraisal is directly contrary to the trial court's conclusion that Reliant initiated this lawsuit "before Daniel Cooper was required to appoint an appraiser." This and other objections to the court's findings of fact are founded on the proposition that the trial court's findings and conclusions should not have been binding on the jury—a proposition we have already rejected. (See pt. 1 of the Discussion, *ante*.)

## 6.    Prejudgment Interest

Civil Code section 3287 authorizes the recovery of prejudgment interest. Under subdivision (a), "[a] person who is entitled to recover damages certain, or capable of being made

certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day . . . ."  Under subdivision (b), "[e]very person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

Here, the court awarded prejudgment interest of $1,492,747.98 on the damages award of $6,028,786.  (There is no claim that prejudgment interest on the buyout damages was improper.)  Interest was calculated based on payments to Michaels and Grady beginning in February 2014, when Reliant first began excluding Cooper from distributions, and was calculated to run from the various dates on which payments were made to Michaels and Grady.

On appeal, the Reliant parties argue that the court awarded damages under Civil Code section 3287, subdivision (b), "based on Cooper's unliquidated damages," and the award was erroneous because under subdivision (b), the court cannot award interest from a date earlier than the date Cooper filed his cross-complaint (July 8, 2016).  They also contend the court awarded prejudgment interest on all payments to Grady and Michaels, instead of on Cooper's one-third share.  Neither contention is correct.

### a.    The background

Cooper initially requested, in his proposed judgment, prejudgment interest on the contract causes of action beginning on December 21, 2015 (the date Reliant filed its complaint), "pursuant to California Civil Code Section 3287(b)."  However, at

43

a January 29, 2020 hearing on the proposed judgment, the court stated interest must be calculated from the date that individual payments or transfers were made to Grady and Michaels. Michaels's counsel agreed with the court, stating that "I appreciate the court basically buying our argument on only getting interest from each date of payment."

At the January 29, 2020 hearing, the court requested a schedule showing all monies coming out of Reliant to Michaels and Grady, plus a calculation of interest from those hundreds of dates. The court explained: "[T]he amounts were certain at the time of those distributions. So do it in this gross amount. I'll round it down to make it consistent with the jury's final award. Some of it will come from the front end. Some of it will come from the back end. But eventually it will round out to a number consistent with the jury's award and consistent with not paying an excess amount on the interest." The court emphasized that the schedule had to show "all monies coming out," not just the first $6 million, but then observed, "I may opt for the first 6 million just to avoid argument."

Cooper prepared the requested schedule "tracking these transfers and calculating prejudgment interest on said transfers." In his posttrial brief, Cooper requested the court award interest "based on the first $6,028,786.00 transferred from Reliant to or for the benefit of Michaels, Grady, or their respective entities."

In response to Cooper's posttrial brief and schedule, Reliant continued to argue prejudgment interest in any amount was "utterly unwarranted." Quoting Civil Code section 3287, subdivision (a), Reliant argued that section 3287 does not authorize prejudgment interest where the amount of damage

44

"depends upon a judicial determination based upon conflicting evidence."

The Reliant parties did not argue that Civil Code section 3287, subdivision (b) applied, or that prejudgment interest could not be awarded on payments made before Cooper filed his cross-complaint in July 2016. Indeed, without waiving the claim that no prejudgment interest was warranted, Reliant provided interest calculations that made various changes to Cooper's presentation, but included distributions beginning in February 2014, long before this litigation was filed. (Reliant filed its complaint in December 2015, and Cooper filed his cross-complaint in July 2016.) And Michaels once again observed that "the Court agreed with Michaels that prejudgment interest could only accrue on damages from the date the payments representing those damages were paid to Michaels."

Cooper's reply argued to the trial court that Civil Code section 3287, subdivision (a) "specifically mandates an award of prejudgment interest," and observed that he submitted "exactly what was requested by the Court," namely, "that all transfers be identified so that the Court could determine which would apply." Cooper pointed out that the court found Cooper was entitled to receive one-third of all monies paid to Michaels and Grady and their entities, and those monies "were—or at the very least should have been—recorded in Reliant's financial books and records and thus would have been either known by Reliant, Michaels, and Grady or capable of being calculated by them."

There was a final hearing on the judgment on March 5, 2020, the day before it was entered. Cooper argued from his spreadsheet that interest calculated from the first $6 million of payments to Michaels and Grady totaled $2,980,092.21. Reliant's

counsel explained that his spreadsheet removed items on Cooper's spreadsheets that were not payments to Michaels or Grady, using only "the distributions that were personal to Mr. Michaels and Mr. Grady for their entities," and calculated interest "on the first 6 million of distributions from that corrected table." (The excluded payments were those Reliant apparently demonstrated at trial "to not be subject to interest calculations," such as payments for policy acquisitions, attorney fees and other items that Cooper claimed were transfers for the benefit of Michaels and Grady.) Reliant's calculation of prejudgment interest on that basis was $1,114,116.08.

The court told Cooper's counsel that his spreadsheets had "amounts that clearly didn't belong there," and stated that "the best numbers available are [Reliant's counsel's]," with the proviso that several specific entries should not have been removed.

The court also explained the basis for using the first $6 million in distributions for the interest calculation: "Because they were so clearly divesting Mr. Cooper of any of that money and . . . I asked for at least two demarcations. One, where they were just bleeding money because they were petulantly refusing to give any of it to Cooper. [¶] Then when they tried to do the corporate restructuring to exclude him—and you have that sort of argument that the jury didn't buy that they were somehow innocently distributing money 50/50 because they thought Cooper was out. [¶] And then the third point is where they—we're in trial and we're post phase 1. Those are sort of my three markers. And that—the easily accounted for money is in that first group. [¶] Second group is a little fuzzy, but I think all the money out throughout that phase is pretty clear. But I think you might have a decent argument that after Michaels left the company

[February 2018], and we're in litigation, you could debate whether Michaels—each of that—any of the money should be allocated to that period because Michaels is gone and it's now Grady doing things. [¶] The cleanest period is when they were both dipping in the till together. Hence, the front end is where I'm starting."

The parties recalculated the interest based on Reliant's spreadsheet (and adding payments relating to the tails and the Friwat policy that should not have been removed from the calculation), resulting in $1,492,747.98 in prejudgment interest.

In his new trial motion on this issue, Michaels again contended "[p]rejudgment interest should not have been awarded at all and therefore the interest awarded is excessive." This was because the "amount of compensatory damages based on . . . one-third of all money received by Grady and Michaels [was] subject to conflicting evidence [and] complex accountings," making prejudgment interest "not justified in this case under the law." Michaels did not argue that Civil Code section 3287, subdivision (b) applied to prevent prejudgment interest on transactions before the cross-complaint was filed.

The court denied Michaels's new trial motion. After quoting Civil Code section 3287 in its entirety, the court said only this: "As a starting point, prejudgment interest is available on a contract-based claim whether or not the claim is capable of certainty under subdivision (b) and is left to the court's discretion. Thus, as to Cooper's first and second causes of action for breach of contract . . . , it is within the court's discretion to award prejudgment interest and the court did so."

47

### b.	Contentions and conclusions

Michaels's opening brief states the trial court awarded prejudgment interest under Civil Code section 3287, subdivision (b), citing the court's new trial ruling.[2]  Michaels then states interest was awarded from the dates of hundreds of payments made by Reliant before this action was filed, which exceed the court's authority under subdivision (b).  That is the extent of Michaels's argument on this point in his opening brief.

Cooper responds that prejudgment interest on the contract damages "was based on [Civil Code section 3287,] subdivision (a), not (b), because the damages were capable of being made certain by calculation."  Cooper says "all one needed to do was calculate the amount Michaels and Grady received and divide by three."  Further, Cooper contends that Michaels did not argue in the trial court that prejudgment interest could not accrue before the date the action was filed, and so has forfeited the argument.

In his reply brief, Michaels says Cooper has "fabricated an argument" and contends Cooper is not entitled to prejudgment interest under Civil Code section 3287, subdivision (a) because he did not request it.  Neither of those contentions is true, as is apparent from the proceedings we have just recited.

Then Michaels contends Cooper cannot recover interest under Civil Code section 3287, subdivision (a) because the damages "were not capable of being made certain by calculation,"

---

[2]	Michaels repeatedly cites the trial court's new trial ruling when he contends the court awarded prejudgment interest under Civil Code section 3287, subdivision (b).  We do not view the trial court's statement to mean that it intended the award to be based on subdivision (b).  We view it as a statement that its award would be within its discretion "whether or not the claim is capable of certainty," and nothing more.

48

and "[d]amages the trier of fact determines based on conflicting evidence do not satisfy this requirement of certainty." Michaels relies on *Lineman v. Schmid* (1948) 32 Cal.2d 204, 212 (*Lineman*). But *Lineman* actually held that "[t]he rule appears to be uniform, whether the case involved contract price or reasonable value, that interest is not allowable when damages cannot be computed except on conflicting evidence . . . *because of the absence of established or reasonably ascertainable market prices or values.*" (*Ibid.*, italics added; see also *County of Los Angeles v. Southern California Edison Co.* (2003) 112 Cal.App.4th 1108, 1123 ["Damages that must be determined by the trier of fact based on conflicting evidence of the property value do not satisfy this [certainty] requirement."].) This is not such a case.

Here, the amounts and dates of transfers to or on behalf of Michaels and Grady are established and certain; the disputes on the calculations were over whether certain payments to parties other than Michaels and Grady should or should not be included in the schedule.

The precedents discussing the issue of certainty make it clear that this is a proper case for prejudgment interest under Civil Code section 3287, subdivision (a). As *Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279 (*Watson*) tells us, under subdivision (a), "the trial court has no discretion—it must award prejudgment interest from the first day there exists both a breach and a liquidated claim." (*Watson,* at p. 293.)

*Watson* explains: "From the defendant's perspective, the certainty requirement promotes equity because liability for prejudgment interest occurs only when the defendant knows or can calculate the amount owed and does not pay. (*Chesapeake*

[*Industries, Inc. v. Togova Enterprises, Inc.* (1983)] 149 Cal.App.3d [901,] 906.) In *Chesapeake*, the court acknowledged the tension between compensating the plaintiff's loss and fairness to the defendant, stating: 'These competing policy considerations have led the courts to focus on the defendant's knowledge about the amount of the plaintiff's claim. The fact the plaintiff or some omniscient third party knew or could calculate the amount is not sufficient. The test we glean from prior decisions is: did the defendant actually know the amount owed or from reasonably available information could the defendant have computed that amount. Only if one of those two conditions is met should the court award prejudgment interest.' (*Id.* at p. 907, italics omitted.)" (*Watson, supra,* 2 Cal.App.5th at pp. 293–294.)

Here, there is no question whether the Reliant parties could have computed the amounts they owed Cooper from each of the distributions Reliant made to Michaels and Grady, because that is exactly what they did in the trial court.

Michaels makes a second argument: that the trial court awarded prejudgment interest "on all payments to Grady and Michaels, instead of Cooper's one-third share," and this gave Cooper a "windfall" because it gave him interest "on amounts he had no right to recover yet." Instead, Michaels claims, Cooper's damages "should have vested incrementally over a five-year period ending November 2019, as Reliant made payments to Michaels and Grady."

Again, Michaels did not make this argument to the trial court (or at least does not point us to any place in the record where he did so), and we may consider it forfeited. In any event, there was nothing "arbitrary," as Michaels claims in his reply

50

brief, about the trial court's decision to compute interest based on the first $6 million of payments to Michaels and Grady, as recounted above ("[t]he cleanest period is when they were both dipping in the till together").  Those payments were improper when made, and we see nothing inequitable about calculating interest based on the entirety of the improper payments, until the $6 million in jury-awarded damages is reached.  Cooper did not obtain a "windfall" in prejudgment interest.

Finally, we turn to an argument offered by Grady and Reliant, who say that Cooper elected a tort remedy (because he sought and obtained punitive damages on his causes of action for fraud and breach of the duty of loyalty).  According to Grady and Reliant, any prejudgment interest is therefore available only under Civil Code section 3288, which provides that in an action for breach of an obligation not arising from contract, "interest may be given, in the discretion of the jury" (*ibid.*), and "that did not happen here."

Grady and Reliant cite no relevant authority for their claim that Cooper elected a tort remedy, and refer us to another section of their brief.  There, they argue that "contract *and* tort damages cannot both be properly awarded."  By this they apparently refer, as the trial court put it, to an argument that "Cooper must elect between punitive damages on his fraud claim and attorney fees, prejudgment interest and other amounts auxiliary to a breach of contract claim."  This argument fails for multiple reasons.

First, Grady and Reliant fail to support their assertions with references to the record.  They say the court concluded the argument was waived because it was not timely raised, and assert the court was wrong.  They do not cite the court's ruling.  They refer to a November 20, 2019 declaration by Grady's

51

counsel, but do not tell us where that can be found. (We found it on our own. The declaration says nothing about election of remedies.) They say the election of remedies doctrine was "timely raised and vigorously litigated" but refer only to "various filings prior to trial" and "the trial transcripts," citing nothing. The only record citation in their argument is to the answer to Cooper's cross-complaint, the 13th affirmative defense of which states Cooper's claims "are barred by laches, waiver or estoppel." On this basis alone, we may consider the argument forfeited.

Second, the trial court rejected a similar claim by Michaels (that Cooper cannot elect inconsistent remedies in the judgment) when the court denied his JNOV motion. The court pointed out the judgment was structured to avoid double recovery; that fraud damages and breach of contract damages do not always require election; that there was no duplication of regular damages; and that "Michaels has not sufficiently demonstrated that the attorney fees and the punitive damages arise from the exact same facts, and they do not."

Third, Grady and Reliant offer no discussion of the authorities on election of remedies, citing but not discussing *Roam v. Koop* (1974) 41 Cal.App.3d 1035 (*Roam*). As pertinent here, *Roam* explained that the doctrine of election of remedies "is theorized on the principle of estoppel. 'Whenever a party entitled to enforce two remedies either institutes an action upon one of such remedies or performs any act in the pursuit of such remedy, *whereby he has gained any advantage over the other party, or he has occasioned the other party any damage,* he will be held to have made an election of such remedy, and will not be entitled to pursue any other remedy for the enforcement of his right.' " (*Id.* at pp. 1039–1040, italics added; see also *Glendale Fed. Sav. &*

52

*Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 137, 138 ["the doctrine of election of remedies, bottomed upon the equitable principle of estoppel, operates only where pursuit of alternative and inconsistent remedies substantially prejudices the defendant"; "[e]lection of remedies is a harsh doctrine and is currently looked upon with disfavor by courts and commentators"].)[3]

Here, of course, Cooper occasioned no injury to Grady or Reliant and gained no advantage over them in the course of the litigation.  We find no merit in the election of remedies argument, either as it relates to prejudgment interest or anything else.

**7.    The Cooper-Michaels Settlement Agreement**

In their briefs on appeal from the third amended judgment, Michaels, PB Consulting #1, PB Consulting #2 and 18LS Holdings contend that a settlement agreement between Michaels and Cooper in another litigation barred any tort liability or constructive trust remedy imposed against Michaels or his related entities in this lawsuit.  They say the judgment should be reversed and sent back to the trial court to determine whether

---

[3]    The issue in *Roam* was "whether the trial court erred in granting a tort remedy when [the plaintiff], after filing his complaint, had levied on certain of defendant's property under a writ of attachment."  (*Roam, supra,* 41 Cal.App.3d at p. 1037.)  Levying under the writ "deprived [the defendant] of the use of his property and plaintiff obtained an advantage over him."  (*Id.* at p. 1040.)  Under those circumstances, "presumptively the doctrine of election of remedies is applicable."  (*Ibid.*)  The court ultimately affirmed the judgment because the defendant failed to raise the election defense at trial and therefore waived it.  (*Id.* at p. 1045.)

the settlement agreement bars the tort claims and related equitable remedies. We think not.

### a. The facts

Cooper and Michaels were parties to a settlement agreement effective December 18, 2017, relating to their separation agreement, various lawsuits and other disputes. (The parties refer to this as the SMDC case (*Cooper v. Michaels*, Super. Ct. L.A. County (2018) No. LC105527).) The parties released each other from all claims and liabilities relating to the separation agreement, the lawsuits and ancillary disputes, with the exception of the claims alleged in this case. As to this "non-released matter," the parties agreed that Cooper would "dismiss without prejudice Michaels, in his individual capacity only," as to the tort causes of action (as relevant now, fraud, breach of the duty of loyalty, fraudulent transfer, and constructive trust). "In exchange for this dismissal without prejudice, Michaels agrees to make best efforts, including utilizing his vote as a member of Reliant, to secure a distribution from Reliant in the amount of $20,000 per month for six months starting immediately."

Michaels then sent two e-mails to Grady and one to Murphy about the settlement in December 2017, telling them he was "open to giving [Cooper] the money as a show of good faith but this is something the owners and manager would have to discuss." In March 2018, Cooper's counsel inquired what steps Michaels took to secure the distribution to Cooper. Then in October 2018, after the subject of the dismissal came up at Cooper's deposition, Cooper's counsel wrote to Michaels's counsel, saying he had never received a response to his March 2018 request. Cooper's counsel asserted Michaels had confirmed at his deposition that he made no efforts, and "[a]s a result, Mr. Cooper

54

has not and will not dismiss any tort claims alleged against Mr. Michaels."

On November 13, 2018, Michaels filed an ex parte application for (among other things) an order compelling Cooper "to dismiss with prejudice the intentional tort claims" pursuant to the settlement agreement.

The trial court held a hearing on the ex parte application on November 28, 2018. As to the tort-dismissal issue, the court expressed its preliminary thoughts: that the ex parte "doesn't make clear to me that there's anything for the court to do in this case. I do agree that this is not the right vehicle for it. A motion to enforce the settlement under the LC105527 case would be the more appropriate vehicle for it for any failure by [Cooper] to dismiss . . . the tort claims against that one individual [Michaels]."

The court also wondered "where does that get you" when "the most you get is dismissal of those claims without prejudice." "[I]f [Cooper] would simply re-file those same claims, I guess, based on everything that's happened since 2015 or whenever the settlement agreement was signed, where does that get you on the one hand?" On the other hand, Cooper "didn't dismiss the claims, so they don't have to pay. . . . [W]here does that go?" The court observed that "now you're on the eve of trial," and "[h]ow do you do any of that without prejudicing [Cooper]? I suspect the response and the argument at this point is that you waived."

When the court asked for responses to its preliminary thoughts, Michaels's counsel stated: "Your Honor, I'll take you up on the invitation to refile it in the SMDC matter. I think, as a practical matter, that may end up in front of you." Counsel agreed with the court that procedurally, the SMDC case would be

55

the right vehicle, and "We'll employ that. That being said, I won't get into the balance of it, because there's not going to be a ruling on it." The court interjected that it was "not stating any firm opinion on any of it. These are just observations. It . . . didn't sit right as an ex parte and untethered to a more substantial motion." Michaels's counsel replied, "Understood." Later comments by the court ("[w]e'll leave that [a jurisdictional issue] for the motion") make it clear that both the court and counsel anticipated a further motion being made on the issue. So far as the record discloses, none was made. (Cooper requested judicial notice of the docket in the SMDC litigation, which we grant.)

### b. Contentions and conclusions

Now, Michaels contends "[i]t was error for the trial court not to decide the *Ex Parte* Application to enforce the settlement agreement" before the phase one trial. Michaels cites no authority for this proposition.

We note that when Michaels sought a new trial, arguing the court erred in excluding evidence of the December 2017 settlement from the phase two jury trial, the court denied the motion, stating: "The evidence was irrelevant to the issues to be tried. There would have needed to be a mini trial on whether Cooper did breach the settlement agreement. The evidence would have resulted in wasting trial resources on a tangential issue." We agree with that conclusion.

Michaels's argument here is similarly unavailing. The facts we have recited show the court chose to wait for a further, "more substantial," motion in the other action on the issue of enforcement of the settlement agreement, a conclusion with which counsel concurred. That ruling was well within the trial

56

court's discretion, and the court did not err in excluding evidence of the December 2017 settlement from the phase two jury trial.

## 8. Constructive Trust Issues

PB Consulting #2 and 18LS Holdings—the two LLC's found to be Michaels's alter egos—contend it was error to include them in the orders imposing a constructive trust over the Friwat policy and the tails. The two LLC's say they were indispensable parties who were not made parties to the action; they were deprived of due process because their interests were not represented before the court's June 27, 2019 order; and there was insufficient evidence to warrant a constructive trust because the amount of damages had not been determined by a jury. We see no error.

### a. The facts

To recap, both LLC's were found to be alter egos of Michaels, and we have already concluded sufficient evidence supported that finding. (See Discussion, pt. 3, *ante*.)

PB Consulting #2 was formed for the sole purpose of investing in the Friwat policy. Michaels owned 51.83 percent of PB Consulting #2, having invested more than $5.1 million in the Friwat policy. That money was money from Reliant, and Reliant money was also used to pay the premiums on the Friwat policy.

18LS Holdings was formed by Michaels and Luke Walker (a nonparty), and Michaels then transferred unsold policy tails to 18LS Holdings from Reliant. Michaels paid $1,000 to Reliant for the $440,000 in tails transferred to 18LS Holdings. (Grady paid nothing for his $440,000 in tails.) Mr. Walker's testimony confirmed 18LS Holdings "exists solely for the purpose of owning portions of unsold insurance policies [forfeited positions] that belong to Reliant."

Upon Mr. Friwat's death, Michaels was to receive $5,428,666.65 of the policy proceeds, with the rest of the proceeds going to PB Consulting #2's other members. When Mr. Friwat died, the trial court ordered the insurer to distribute the amounts due members of PB Consulting #2 (other than Michaels) to PB Consulting #2, and ordered PB Consulting #2 to distribute those proceeds to those members. Thus, the only amounts from the Friwat policy remaining subject to the constructive trust were the Michaels proceeds (distributed to Cooper when the judgment was entered).

### b. Contentions and conclusions

On the facts just recounted, it is hard to see any prejudice to PB Consulting #2, whose sole purpose was to invest in and distribute proceeds of the Friwat policy to its members. That has been done. As for 18LS Holdings, Luke Walker was the only nonparty member, and there is no evidence he paid anything for the tails, so he cannot have been prejudiced either. The bottom line is that both LLC's were entities controlled by Michaels, and found to be his alter egos.

In any event, the two LLC's fail to establish they were indispensable parties. They made no such claim in the trial court. Here, they say it is "readily apparent" from the court's February 4, 2019 and June 27, 2019 constructive trust orders that they were "in fact indispensable parties necessary to afford Cooper the relief he sought and purportedly that which he was entitled to." They do not explain how or why, merely claiming they were required to be parties "for the trial court to exercise jurisdiction over them, and bind them by its orders." They cite *Kraus v. Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, but do not explain how it helps them. *Kraus* explained, for

58

example, that "the failure to join an 'indispensable' party is not 'a jurisdictional defect' in the fundamental sense; even in the absence of an 'indispensable' party, the court still has the power to render a decision as to the parties before it which will stand." (*Id.* at p. 364.) *Kraus* also quoted with approval the principle that " '[t]he only justification for the [indispensable party] rule permitting the issue to be raised for the first time on appeal is that the absence of a party has precluded the trial court from rendering any effective judgment between the parties before it.' " (*Id.* at p. 369.) That is not the case here.

In short, the indispensable party claim has no merit. Neither does the claim that the two LLC's were deprived of due process because they received no notice or opportunity to object to the orders imposing a constructive trust over their assets. This claim fails for the reasons already discussed. Both LLC's were entities controlled by Michaels and found to be his alter egos. PB Consulting #2 had no real interest in the proceeds of the Friwat policy; it existed only as a vehicle for investing and transferring the proceeds to its members.

Michaels likewise controlled 18LS Holdings; when the parties discussed how a constructive trust "might be more fairly created . . . and reach beyond the Friwat policy alone," the Reliant parties themselves suggested the insurance tails as a component of the constructive trust. Counsel stated at the subsequent hearing: "We're willing and know how to put that into a trust." We agree with Cooper that this "not only bolsters the trial court's finding that 18LS was Michaels's alter ego, but establishes that the parties with authority to transfer the tails were before the trial court."

Finally, the two LLC's argue the constructive trust itself was improper, because "[t]here was no determination as to how much Cooper was owed," so the court "could not know how much to issue a constructive trust for, or over what." The two LLC's cite no authority for this proposition, and it is plainly untrue.

The trial court determined that Cooper remained a one-third owner of Reliant and was entitled to receive one-third of all monies and assets that had been transferred from Reliant to Michaels, Grady and their respective entities, an amount found to be at least $11,724,675.94. That suffices for the imposition of a constructive trust over Michaels's interest in the Friwat policy and the tails.

Three conditions must be satisfied to impose a constructive trust: "(1) the existence of a *res* (property or some interest in property); (2) the *right* of a complaining party to that res; and (3) some *wrongful* acquisition or detention of the res by another party who is not entitled to it." (*Communist Party, supra,* 35 Cal.App.4th at p. 990; see *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116 ["All that must be shown is that the acquisition of the property was wrongful and that the keeping of the property by the defendant would constitute unjust enrichment."].) The facts we have just recounted demonstrate there was no abuse of discretion in the trial court's imposition of a constructive trust.

## 9. The Third Amended Judgment

On March 2, 2021, Cooper filed a motion to amend the second amended judgment to add Romelli Cainong, the trustee for three of Michaels's trusts (the 2007 Irrevocable Octopus Trust, the RLM Trust, and the 2007 Irrevocable MMA Trust), as

additional judgment debtors. The trial court granted that motion on April 28, 2021.

Ms. Cainong appeals, claiming the court had no jurisdiction over her because she was not properly served with Cooper's moving papers. Michaels contends the motion was an improper motion for reconsideration that should have been denied.

We reject both claims.

### a.    The background

On August 17, 2020, Cooper moved to amend the March 6, 2020 judgment to include the Michaels and Grady entities, including Ann-Marissa Cook as trustee for the three Michaels trusts, as additional judgment debtors. This was because, despite the court's alter ego findings, the judgment did not allow Cooper to take enforcement actions against those entities.

The court found that PB Consulting #1, LLC; PB Consulting #2, LLC; 18LS Holdings, LLC; and LaForce Holdings, LLC, were additional judgment debtors. But in its September 29, 2020 ruling, the court declined to add the trustees of the various trusts as additional judgment debtors. Accordingly, the second amended judgment was entered on October 6, 2020, adding only the LLC entities, not the trustees of the trusts. Five months later, the court recognized and corrected its error.

In March 2021, Cooper moved to amend the second amended judgment to add Ms. Cainong, as trustee of the three Michaels trusts. His motion stated that evidence was produced in connection with Michaels's debtor examinations (on October 6 and November 16, 2020) establishing that Ms. Cainong (Michaels's partner) had replaced his sister (Ms. Cook) as the trustee, and that Michaels exerted such control over the trusts that the trustees (Ms. Cainong) were a figurehead who complied

61

with his instructions, and there was no distinction between the two.  (One of the exhibits to Michaels's November 16, 2020 deposition is a January 2, 2020 e-mail from Ann-Marissa Cook stating she was resigning as trustee.)

At the hearing on April 7, 2021, the court "acknowledge[d] that the Court made an erroneous ruling in denying the motion to amend the judgment to add . . . Ann-Marissa Cook as trustee of the various Michaels-related trusts."  "[I]n looking at the analysis and the ruling, the Court just flat out got it wrong."  But the court believed it had no jurisdiction to correct the error because "at the end of the day, it is a motion for reconsideration" with no material change in circumstances, citing Code of Civil Procedure section 1008.

Counsel for Cooper asserted that the court had made its September 29, 2020 ruling without prejudice, and the court requested further briefing on whether denial without prejudice would allow the court to treat the current motion as an original request and proceed accordingly.  A hearing was set for April 28, 2021.  The court also stated, in response to assertions that the written ruling did not state it was without prejudice, that if the transcript reflected a denial without prejudice, the court could correct the written decision to reflect what the court intended.

There was further briefing, not in the record, and at the April 28, 2021 hearing, no mention was made questioning the court's jurisdiction, with the parties arguing only the merits of the control issue.  The court granted the motion to amend the judgment, stating it was "satisfied based on the Cooper parties moving papers and the arguments set forth this date."  The third amended judgment was entered May 12, 2021.

### b. The trustee's jurisdictional claim

The trustee of the three trusts, Ms. Cainong, contends her due process rights were violated because the trial court had no jurisdiction over her. She claims she was not properly served with Cooper's motion to amend the judgment. She is mistaken.

Cooper served his motion to amend the judgment by Federal Express on March 2, 2021, at an address in Las Vegas, where Ms. Cainong lived with Michaels (according to Michaels's testimony).[4]

Ms. Cainong contends that Code of Civil Procedure section 415.40 applies. Section 415.40 governs service of a summons and complaint on a person outside the state. (Service may be done "in any manner provided by this article or by sending a copy of the summons and of the complaint to the person to be served by first-class mail, postage prepaid, requiring a return receipt." (§ 415.40.)) Ms. Cainong says the various methods for service of a summons and complaint do not include Federal Express.

As Ms. Cainong necessarily concedes, the service at issue here is *not* the service of a summons and complaint, and she offers no authority for her contention that the motion to amend the judgment was "akin" to service of a summons and complaint. In the absence of any such authority, we see no reason to treat Cooper's motion to amend the judgment as subject to different

---

[4] Cooper also served the motion by personal service on the owner of Postal Annex at 21781 Ventura Blvd., Woodland Hills, California, on March 4, 2021. That address had been listed by the previous trustee, Ann-Marissa Cook, as her office address, and Ms. Cainong's opening brief states that Ms. Cook "kept an office at 21781 Ventura Blvd."

procedural requirements than any other motion.  Particularly is this so given the court's findings in phase one of the trial that the evidence established Michaels used the three trusts as extensions of himself.

In her reply brief, Ms. Cainong contends that service of the motion was improper under Code of Civil Procedure section 1013 (cited by Cooper in his respondent's brief).  She makes an elaborate argument that service was defective under section 1013, subdivision (a), because it did not provide the additional 10 days allowed by subdivision (a) for service by mail out of state.  Ms. Cainong is wrong on this point, too.

Assuming Code of Civil Procedure section 1013 applies, subdivision (c), not subdivision (a), would govern service by overnight delivery, and that subdivision provides that any period of notice after service by overnight delivery "shall be extended by two court days."  (*Id*., subd. (c).)  Moreover, section 1005, subdivision (a)(13) applies to any proceeding "under this code in which notice is required, and no other time or method is prescribed by law or by court or judge."  Section 1005 provides that, "[u]nless otherwise ordered or specifically provided by law, all moving and supporting papers shall be served and filed at least 16 court days before the hearing," and "if the notice is served by . . . another method of delivery providing for overnight delivery, the required 16-day period of notice before the hearing shall be increased by two calendar days.  Section 1013, which extends the time within which a right may be exercised or an act may be done, does not apply to a notice of motion . . . governed by this section."  (§ 1005, subd. (b).)

Cooper's motion was served on March 2, 2021, and the hearing was held 36 days later, on April 7, 2021.  There is no

merit to the claim that service was defective or that Ms. Cainong's due process rights were violated.

### c. Michaels's appeal

Michaels contends Cooper's motion to amend the second amended judgment was an improper motion for reconsideration that should have been denied. Michaels argues the motion "did not comport with the procedural requirements" of Code of Civil Procedure section 1008, citing *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 833 (*Even Zohar*) (section 1008 "imposes special requirements on renewed applications for orders a court has previously refused. A party filing a renewed application must, among other things, submit an affidavit showing what 'new or different facts, circumstances, or law are claimed' (*id.*, subd. (b)) to justify the renewed application, and show diligence with a satisfactory explanation for not presenting the new or different information earlier.").

Here, Michaels argues, the only substantive difference between this motion and Cooper's previous motion to amend—which the court denied as to the trustees (then Ms. Cook)—is the identity of the trustee. He also says the declaration submitted in support of the motion "does not explain how Trustee Cainong or the trusts acted as alter egos for Michaels," and so the judgment should be reversed.

Cooper responds that his motion to amend the judgment was not a motion for reconsideration; rather, the motion sought to add a different trustee, and it was based on evidence from Michaels's later judgment debtor examinations. That evidence revealed that Ms. Cainong had replaced Ms. Cook in January 2020, before Cooper's previous motion; the new evidence also

showed Michaels's involvement in and control over the trusts. Cooper further argues that, even if treated as a motion for reconsideration, an exception stated in *Even Zohar* would apply: Code of Civil Procedure section 1008 " 'do[es] not limit a *court's* ability to reconsider its previous interim orders on its own motion,' even while it 'prohibit[s] a *party* from making renewed motions not based on new facts or law . . . .' " (*Even Zohar, supra,* 61 Cal.4th at p. 840, quoting *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1096–1097 (*Le Francois*).)

We agree with Cooper. Even if his motion to amend the judgment was an improper motion for reconsideration—and it was not—under *Le Francois,* the trial court had the authority to change its previous erroneous ruling on its own motion. That is effectively what the court did. At the April 7, 2021 hearing, the court began the discussion by stating, referring to its ruling denying the motion to amend the judgment to add Ms. Cook as trustee, that "the Court just flat out got it wrong." The court was concerned about its jurisdiction to correct the error, sought further briefing, and held a further hearing before granting the motion to amend the judgment.

We acknowledge that it was Cooper, not the court, who initiated the motion to amend the judgment. But the court's actions thereafter comport with the principles announced in *Le Francois*, and with precedents after *Le Francois.*

*Le Francois* involved successive summary judgment motions on the same grounds; the first was denied and the second was granted by a second judge. (*Le Francois, supra,* 35 Cal.4th at p. 1097.) *Le Francois* found the trial court erred in granting the motion, but did not order the case to trial, holding only that the court erred in granting an impermissible motion. (*Id.* at p. 1109.)

66

"On remand, nothing prohibits the court from reconsidering its previous ruling on *its own motion*, a point on which we express no opinion." (*Ibid.*)

*Le Francois* construed section 1008 "as limiting the parties' power to file repetitive motions but not the court's authority to reconsider interim rulings on its own motion." (*Le Francois, supra,* 35 Cal.4th at p. 1107.) The court stated, "If a court believes one of its prior interim orders was erroneous, it should be able to correct that error no matter how it came to acquire that belief." (*Id.* at p. 1108.)

In *In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301, the court concluded that "the trial court's inherent authority to correct its errors applies even when the trial court was prompted to reconsider its prior ruling by a motion filed in violation of section 1008." (*Id.* at pp. 1303–1304; *id.* at p. 1313 ["In our view, the California Constitution requires that in any case in which a trial judge reconsiders an erroneous order, and enters a new order that is substantively correct, the resulting ruling must be affirmed regardless of any procedural error committed along the way."].)

Here, even if Cooper's motion "did not comport with the procedural requirements of Code of Civil Procedure section 1008," as Michaels asserts, the trial court had the authority to correct its error on its own motion. It did so by acknowledging its error, soliciting further briefing, and holding a further hearing. And, since there was in any event no error in the court's substantive ruling, no prejudice can be shown.

67

## DISPOSITION

The judgment is affirmed.  The Cooper parties are to recover their costs on appeal.


GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.


VIRAMONTES, J.